# Cumberland Valley Railroad Company *against* Baab.

An engagement to pay an incorporated railroad company a certain sum to induce the location of their route at a particular place, is valid and binding, and may be enforced by action.

ERROR to the common pleas of *Dauphin* county.

The President, Managers and Company of the Cumberland Valley Railroad Company against Jacob Baab. This action was brought to recover from defendant the sum of 50 dollars, under the following circumstances:

Upon the 2d day of April 1831, an act was passed entitled an, act to incorporate the Cumberland Valley Railroad Company, which act authorized the commissioners therein named to receive subscriptions to the capital stock of the company, in the manner and form therein specified, each subscriber promising to pay 50 dollars for each share subscribed by him, and paying down five dollars on each share at the time of the subscription. The act authorized the subscription of four thousand shares, but directed that on fifteen hundred shares being subscribed, and five dollars on each share being paid, the governor should issue his letters patent incorporating the company, by the name of " The Cumberland Valley Railroad Company." The original act authorized the company, when incorporated, to survey and construct a rail road, " beginning at the borough of Carlisle, in the county of Cumberland, and passing this said county, *by the nearest and best route*, to a point on the Susquehanna river, at or near the borough of Harrisburg, within the same."

By a supplement passed the 15th of April 1835, the original act was revived, and the time for commencing and finishing the work extended for six years, " with full power and authority to construct the railroad from the Susquehanna river, by the way of Carlisle and Shippensburg, to Chambersburg, in the county of Franklin," &c.

By another supplement, passed the 2d of February 1836, the company are " authorized and empowered to build a bridge over the Susquehanna river, at the eastern termination of their railroad, as designated by the act of 2d April 1831, incorporating said company, and to make so much of a railroad on the east side of said

[Cumberland Valley Railroad Company v. Baab.]

river as may be necessary to connect the Cumberland Valley Railroad with the Pennsylvania canal, and with the Harrisburg, Portsmouth, Mountjoy and Lancaster Railroad: the manner in which the connection was to be formed with the Pennsylvania canal to be in accordance with the directions of the canal commissioners," &c.

By the 23d section of the original act, it is provided that if any increase of the capital stock be deemed necessary by the stockholders to complete the said railroad, it may be lawful for the said president, managers and company, at a stated or special meeting convened for that purpose, to increase the number of shares so that they shall not exceed in the whole ten thousand, and to receive and demand the moneys for shares 'so subscribed in like manner, and under like penalties, as original subscriptions of stock.

After the passage of the supplement of 1836, it became necessary to fix the points at which the bridge should cross the river Susquehanna. The inhabitants of the lower end of the borough of Harrisburg were desirous that the bridge should cross the river so as to reach the borough at Mulberry street; whilst it is said that those in the upper end of the borough and Maclaysburg were anxious that it should cross at their part of the town.

A subscription paper was circulated among the inhabitants of the lower end of the borough in the following words, to wit: "If the president and managers of the Cumberland Valley Railroad Company will locate their valley railroad bridge across the river opposite to Mulberry street, Harrisburg, we do severally agree to pay to the Cumberland Valley Railroad Company the sums set opposite our names respectively, for the purpose of purchasing one or more depots on the canal at Harrisburg, near Mulberry street. March 9, 1836."

To this subscription paper, various persons put their names for various sums of money, amounting in all to two thousand six hundred and sixty-five dollars, and among their names, the name of the defendant is subscribed for the sum of fifty dollars. His handwriting to the subscription has been proved, and it has also been testified that the company have constructed their railroad bridge across the river Susquehanna, at or opposite to Mulberry street. That the company has bought a lot for a depot not far from the end of Mulberry street, but they have first to run up to near Market street, and then down the Lancaster railroad to get to it. Their own road is too high to approach the depot from it.

The court below was of opinion that the contract was against public policy, and without consideration in law, and directed the jury to find for the defendant.

*M'Cormick*, for plaintiff in error, cited 2 *Bingh*. 242; *Chit. on Con*. 217; 2 *Penn. Rep*. 466.

*J. A. Fisher*, for defendant in error.

[Cumberland Valley Railroad Company v. Baab.]

The opinion of the court was delivered by

GIBSON, C. J.—The decision in the Hibernia Turnpike *v.* Henderson turned on the construction of a statute. The contract of subscription was regulated by the act of incorporation, in the interpretation of which, it was held that the public interest was so much concerned in the scheme that prompt payment of the instalment which was required to be counted down at the time of subscription, could not be dispensed with by the commissioners, or subsequently by the company: the contract before us is regulated, or expressly prohibited by no statute whatever. It certainly was held, that the public had an interest in the question of location which it was the purpose of the legislature to protect by excluding fictitious subscriptions; and to preclude an improper influence from being gained by means of them in the election of the first board of managers, was assigned as the motive which induced the legislature to insist on immediate payment of a part of the subscription as a stake in the company's concerns. The object evidently was to prevent a choice favourable to the interests of influential proprietors on the proposed route, but prejudicial to the interests, not only of the company, but of the state which also was a stockholder, and we were constrained by these considerations to enforce the condition of payment with extreme rigour. But it was not intimated that if present payment of a part of the subscription had not been expressly exacted by the statute, the public interest would nevertheless have made it indispensable to the legality of the contract. It is here that a corporation, being *ens legis*, has no inherent power to act, or indeed any power at all beyond what is necessary to accomplish the end of its being: but it is also true that within the scope of its legitimate functions it may act as a natural person might. In defining its powers, it would be impracticable to enumerate them specifically, or to do more than circumscribe the field of its action, leaving it to exercise all those that are incidental and necessary to the purpose of its creation. Now to fix the terminus of a road or the site of a bridge, when that has not been done by the act of incorporation, is certainly an incidental power; and did we recognise any other limitations of it than those that are expressed in the charter, we should fall into a labyrinth of contradictions and doubts. The conditions of the contract of subscription were expressly prescribed in the Hibernia Turnpike *v.* Henderson, and Irvine *v.* The Susquehannah and Philipsburg Turnpike; in the latter of which it was said that, though an expectation of benefit to the holders of property contiguous to the route had been a powerful spring in putting these artificial bodies in motion, yet that it had never been suffered to become a condition of the contract of subscription. In the case at bar, the subscription is not to the stock; and there is consequently no express regulation or prohibition of it in the charter; without which the supposed resemblance of it to the cases quoted, is barely imaginary. In Irvine *v.* The Susquehannah, the rights of the corporators were

[Cumberland Valley Railroad Company v. Baab.]

declared to be inviolable; but the public interest was said to be paramount to every thing else. If, then, the right to determine a question of location is a corporate one, it is paramount even to the public convenience; and there is abundant reason that it should be so. A company is not bound to make the best road, and upon the best ground that can be had by an unlimited outlay: it is enough for the public that it does the best it can with its means. The sum subscribed is usually inadequate to the end, and it would surely not promote the public convenience to preclude recourse to any other means which might be put by accident within its reach. As inducements to the undertaking, contributions on the ground of individual, as well as of corporate interest, may be legitimately calculated upon. Without the purchased assistance of a part of the inhabitants of Harrisburg, this company might possibly have been unable to construct any bridge at all; and how public convenience would have been promoted by interdicting the use of it, is a mystery which it would be hard to penetrate. To say that the competitors for the location might equally have encouraged the work by subscription to the capital stock, is to say nothing. For its own sake, they were not disposed to encourage it at all; and we should ask too much did we require the company to forego the power given to it by its position of procuring assistance in compensation of equivalent advantages bestowed. Nor is it to be inferred from the clause which allows of an increase of the capital by an increase of the shares, that it was intended to prohibit an increase of it in any other away. That is an enabling, not a disabling clause, its object being to enlarge the sphere of the company's action for general purposes, not to restrain it in a particular thing. And a subscription of additional shares to the stock would have directly given the subscribers that very influence in the direction of the company's affairs, which has been so earnestly deprecated. The election of managers by means of a fictitious subscription, is certainly an evil which the legislature, in the cases quoted, wisely interfered to prevent; but to be allowed to do the best for the company's welfare by the use of every means not expressly interdicted is one of the conditions on which the stockholders subscribed their money, and it is one by which the public will not be found to suffer; for managers will doubtless have sufficient sagacity to see that the location which best serves the public, is that which will give the company the greatest run of customers. It is most politic, therefore, to let such a company manage its affairs according to the dictates of its interest. Its managers will doubtless select the best route and occupy the best positions in order to enjoy the present advantages of them, as well as to preclude future competition; and for that reason, the interest which the state has in the work, may safely be committed to their direction. We cannot say, therefore, that the contract on which this action has been brought, is illegal on grounds of public policy.

Judgment reversed, and a *venire de novo* awarded.