David Campbell, Special J.,
delivered the opinion of the Court.
*576 The Nashville & Northwestern Railroad Company., on the 4th of January, 1860, brought suit in the Circuit Court of Davidson, against John Jones and Andrew J. Baker, administrators of Isaac Jones, deceased, to recover the amount of two calls of ten per cent, each, one due 1st day of March, 1856, and the other due 1st of April, 1856, upon thirty shares of the capital stock of said company, alleged to have been subscribed and taken by their intestate. The first one of the subscription agreements, bears date the 1st day of July, 1854, and the second on the 1st day of January, 1855. The declaration contained two counts, based upon these agreements, which were in each count, stated to be conditioned agreements; and in each count, compliance with the condition on' the part of the company, was averred. The defendants plead non assumpsit and failure of consideration: both of them in short. They also plead two special pleas, in the nature of cross actions, setting out a change of the location of the railroad. To these two special pleas, there were replications by the company, admitting the change of location of the road, but averring that the new route was the best and shortest. These replications were demurred to, and the demurrer was overruled. The issues joined in the pleadings, were submitted to a jury, who, under the charge of the Court, found a verdict for the plaintiff for the sum of six hundred and ninety-one dollars and sixty-two cents; upon which, defendant’s motion for a new trial having been overruled, judgment was given for the plaintiffs. The defendants took their *577 Bill of exceptions to the action and charge of the Court,' and appealed in error to this Court.
On the 20th of April, 1855, as proven before the jury, the Board of Directors of the Railroad Company, passed this resolution: “That the Nashville & North-Western Railroad, he, and the same is hereby, located, from Hanner’s Ford down Harpeth, and near Isaac Jones’; and thence up Turnbull and Beaver Dam; and thence by Contrary Pond, along the Tennessee ridge to Coffman’s grave.” Before the adoption of this resolution, and in fact, before either of Isaac Jones’ subscription agreements were made, this route had been surveyed by George H. Hazlehurst. It was known as the “Harpeth and Turnbull Route,” and ran up Beaver Dam valley, within a hundred yards of Jones’ forge, being called, indifferently, the “Hazlehurst route,” or the “Harpeth and Turnbull Route.” Isaac Jones owned a tract of land of some fifty-one hundred acres, with a forge on it, and a valuable water power at the forge, and this route ran through the forge yard. The construction of the railroad upon it, would enable Jones to load and unload from the cars in' his forge yard. The forge had not been in operation for many years, but had always been a successful forge, when in operation, and could be put in operation at any time. There were valuable ore banks upon this tract of land, owned by Jones, from which the ore could be brought on the railroad to the forge. The construction of the railroad upon this route, would have added many thousands of dollars to the value of the tract owned by Jones. The Company *578 appears never to have done any work on, or towards the construction of the railroad upon this route, nor indeed anything, except the final act of locating the road thereon, by a • resolution of the Board of Directors, though there was considerable work done on other portions of the line. Sometime in the early part of the year 1856, and certainly before the month of April, Isaac Jones died, at which time, and for a considerable period previously, the Company would seem to have suspended work almost, if not entirely, upon the whole line of its road.
The tract of land owned by Jones, was, on the 10th day of April, of the same year, sold for the purpose of partition, and brought the sum of $5,100. It would have brought twice that sum, if it had been supposed the road would ever have been built. It would, as testified by the witnesses, have brought as much, if the route had never been surveyed and formally located. The calls made upon Jones' subscriptions, were- paid up to his death, and the pleadings assume that some calls, made after his death, were paid by his administrators. But if they were, the sums so paid must have been small, since the suit is brought for the calls due in March and April,. 1866, leaving only the two months of January and Eebruary, in which calls made after his death could have been paid by them, if he died in 1856.
The other route, known as the “Sullivan Branch Boute," was always considered the cheapest and best for the railroad, if the Company could have got the subscription on that route. On this latter route the *579 road was located, in September, 1859, or about that time. This route leaves the Hazelhurst route about two miles this side (east) of Jones’ forge, and near Jones’ dwelling house, on a different tract of land, and does not join that route again for fifteen miles beyond the forge. The two routes are entirely different; at some places five or six miles apart. The new route runs up North of Beaver Dam Valley, and with Sullivan’s Branch. It is, as testified by the engineer, some three miles shorter than the Hazel-hurst route; was fifteen thousand dollars cheaper to build; and the construction of the road upon it will save fifty thousand dollars, in the expenses of running trains on the road in ten years.
At the forge, on the Jones place, the two routes are, as stated by the engineer, some twenty-five hundred feet apart, with a bluff between them; and, as proven by another witness, half a mile apart, and the bluff between them a high one. The road from the forge to the new road, is at least a mile and a half in length, and a very bad one. Some two hundred acres of Jones’ forge tract of land, is good tillable land, and the balance of it is thin land, but all of it is well wooded. The change of the road from the original to the new route, materially damaged this land. The new route is the shortest, cheapest and best route for the construction of the railroad. On the adoption of the new route, the old one was entirely abandoned; and at the time of the trial of this case, the road was being constructed on the new route. Upon this state of facts the Court charged the jury:
*580 1st, That the contract of subscription was a conditional one, and to entitle the plaintiff to recover, it must show the performance of the condition.
2d, That the words of the contract were to be understood in their common and popular sense, unless the proof shows that they have acquired an artificial and technical sense.
3d, If the word “locate” were used in the contract in its common and popular sense, it meant to build and construct tbe road.
4th, But if the proof shows the word “locate,” had, when used in reference to the locality of the railroad, acquired an artificial or technical sense, then the parties would be presumed to have used it in that 'Sense.
5th, If when used in that sense, it meant the survey of the route of a railroad, and the adoption of that route as the line of the road, by a resolution of the Board of Directors, and if the company did, or caused these things to be done in good faith, they were a compliance with the condition, and the subscription of Isaac Jones became absolute.
6th, If the route of the road were so located, in good faith,' and afterwards the company, in good faith, changed such location, such change would not release Jones from his subscription.
7th, If the company, in good faith, intended to build the road on the stipulated route, according to the condition,, and if, while endeavoring to accomplish that object, so far as it had the means, but before t had the ability to accomplish it, Jones died, and *581 his heirs sold the land and parted with all interest in it, and after such sale the company chan'ged the route of the road, such change, though it would be a departure from the letter, would not be a departure from the spirit of such contract or condition, and would not operate to release Jones from his subscription.
The business of the Court was to construe the contract of the parties. But the Court did not do so. It told the jury, that if the word “locate” was to be understood in its common and popular sense, as it was, unless it was shown by proof to have acquired an artificial or technical sense, when used in reference to locating railroads, then the parties to these contracts would be presumed to have used it in that sense. And if, when used in that sense, it signifies the survey and marking of a line, and a resolution of the Board of Directors to adopt that line, as the line of the road, then, if the plaintiff, in good faith, did, or caused these' things to be done, they would be a performance of the stipulated condition as to the location of the road. But the Court wholly omitted to tell the jury in which of these senses, the common and popular, or the artificial and technical one, they were to understand this word “locate” to have been used by the parties.
This omission occurs in a case in which there was not, so far as the record discloses, the slightest proof that the word “locate” had, when used in reference to the locating of railroeds, acquired an artificial or technical sense, or, indeed, any shade of signification *582 different from its obvious, common and popular signification to build and construct the railroad. The effect of tbis part of the charge was to leave the jury to grope along their pathway of duty in the application of the law of the case, as delivered from the bench, to the facts of it, without any clear or definite light whatever, as to what the rules of law were. But the Court’s province was to aid them in the matter of the law of the case, by telling them, affirmatively and directly, if such were its opinion, that the word “locate” was used in those papers in its common and popular sense; and if such were not its opinion, but its opinion was, that the word was used in an artificial or technical sense, acquired by its use in reference to the locating of railroads, then it ought, just as directly and emphatically, to have instructed them that the word would be presumed to have been used by these parties, in these engagements, in that technical or artificial sense. It did neither the one nor the other, leaving the jury to guess in what sense the word was used in these contracts, and then to apply the sense in which they might conjecture it was used, to the facts as they should find them.
The rule of law is well settled, that the Court will not reverse for a mere theoretical error in the charge of an inferior Court, which has no application to the facts of the case, and could not, in any way, have misled the jury. But the charge in this case can derive no support from that rule. What is stated therein as to these two propositions, with what is omitted therefrom, could afford a jury no aid or light 'as to *583 tbe law of the case, and could only have the effect of misleading them. The statements in the second of these propositions, were not the law of the case in any of its aspects. But they were delivered to the jury hypothetically as the law of the case. It was decided by this Court, in the case of McNairy vs. Thompson et al., 1 Sneed, 141, that the sole object of the rules and principles laid down for the exposition of contracts, is to do justice to the parties by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made. The governing principle of construction, is the intention of the parties. That intention may be ascertained by looking to the situation of the parties, the motives which induced the agreement, and the object and purpose designed to be, effected by it.
In the case of William Chapen vs. Peter Gullet and others, 2 Sneed, 275, it was laid down, that though parol evidence cannot be admitted to vary, alter or explain the intention of the parties, as expressed in a written instrument, yet it is no less true, that application must be given, to the contract by the surrounding circumstances: 2 Sneed, 282. The Court decided, in the case of Caines vs. Apnerson & Co., 2 Sneed, 562; 1 G-reenleaf, 60, sec. 278, “that every species of contract may be subject to conditions, by which all estate or interest may command or be enlarged or be defeated. No technical words are necessary to create the condition, or declare its nature,” and that conditions were to be either precedent, or *584 subsequent, according to the fair intention of the parties — to be collected from the instrument. “That technical words, if there were any, to encounter such intention, should give way to such intention.”
“In the present case, it is,” say the Court, “argued that the words “have bargained and sold,” used in the instrument, give character to the contract; and evidently show that a title in prcesenti, was intended to pass. Certainly the words were technical and appropriate to the idea of an executed contract; but when we consider the entire instrument, it is perfectly clear that such was not the intention of the parties.” “No particular words are,” says Story on Contracts, sec. 20, page 33, “necessary to constitute a condition precedent or a condition subsequent.; and if there be any question upon this point, it must be determined by the intention of the parties, as manifested by circumstances of the particular case. For, not only may the exact terms of a condition be modified so as to harmonize therein with the evident intention of the parties; but where no condition has been expressed, it may be implied from the facts of the case.” “A conditional contract” — as defined by this author, Story —“is an executory contract, the performance of which depends upon a condition. It is not simply an ex-ecutory contract, since the latter may be an absolute agreement to do, or not to do, something; but it is a contract whose very existence and performance depends upon a contingency and condition.” “A condition subsequent, is one which follows the performance of the contract, and operates to defeat and annul it upon *585 the subsequent failure of either party to comply with the conditions.” “Thus a devise of land for the purpose of building a school house, provided it he bt$llt on a certain site, was held to be a present grant of land, subject to forfeiture, in case the school house should not afterwards be built:” Parsons on Contracts. “Mutual contracts sometimes contain,” says Parsons, “a condition', the breach of which, by one party, permits the other to throw the contract up, and consider it as altogether null. Whether a provision shall have this effect, for which purpose it must be construed as an absolute condition, is sometimes a question of extreme difficulty. It is quite certain, however, that now no precise words are requisite to constitute a condition. It would be difficult, and perhaps impossible, to lay down rules which would have decisive influence in determining this vexed question. Indeed, Courts seem to agree, of late, that the decision must always depend upon the intention of the parties, to be collected in each particular case from the terms of the agreement itself, and from the subject matter to which it relates.”
The cases of the Henderson and Nashville Railroad Company vs. Lovell, 16th B., Monroe, 358; McMillin vs. Maysville and Lexington Railway Company, 15th B., Monroe, 218; the Wilmington and Raleigh Railway Company vs. Robinson, 5th Iredel, 301; and the Cumberland Yalley Railway Company vs. Bach, 9 Watts, 458, show that contracts of subscription for stock in railroad companies, may be conditional ones; and, indeed, where there is nothing' in the charter of *586 a particular company, prohibiting it from entering into and accepting conditional contracts of subscription, the general rules of law upon the subject of such contracts, (as indeed in regard to all other contracts made by such companies,) must apply to their contracts as they do to the ■ like contracts of individuals. Now, submit the agreements in this case and the charge of the Court below in regard to them, to the test of the doctrines and principles laid down by this Court, in the cases we have cited, and by the other authorities to which we have referred.
The Nashville and North-Western Railroad Company had a charter by which it was authorized to construct a railroad from Nashville to -. On the part of this line, between a point two miles East of what was known as Jones’ Forge, and a point some miles West of that Forge, there were two routes. The best, shortest, and cheapest of these routes for the construction of the road, as well as for the subsequent operation of running trains upon the road, was through, a poor section of country, in which the stock could not be raised for its construction. The second and longest, worse and most expensive of them, was through a rich region of country, as far at least as Jones’ Forge, in which the stock for its construction could be got.
• These facts were known to all the residents of the county, and, unquestionably, the company and Isaac Jones knew them. The latter owned a tract of land on the longer, worse, and most expensive route, upon which there were a forge, ore banks, valuable water *587 power and timber, plenty for tbe use and operation of tbe forge. Tbe company is naturally anxious to obtain subscriptions of stock, for tbe construction of its road. It causes tbe longest, worse, and most expensive route to be surveyed; and, as surveyed, tbe route passes through tbe yard of tbe forge, upon bis tract of land. If the road shall be constructed upon that route, tbe forge will be placed in immediate connection, by railway, with Nashville on tbe east, and tbe Tennessee River on the west, and all tbe products of bis forge, can be loaded upon the cars in bis forge yard, and sent to either point. Its construction there will enhance tbe value of that tract many thousands of dollars. In this state of things, the parties came together, and entered upon tbe agreement upon which this suit is founded. One of the agreements contained this provision: “It is, however, distinctly understood, that the subscription is to be void, unless’ said Company locate its. road on or near George H. Hazel-hurst’s survey, from or about the mouth of Buffalo Branch, on Harpeth, to the summit of Tennessee Ridge, by way of Turnbull and Beaver Dam Valleys.” The other, this one, “to be paid on condition said road shall be located on the Harpeth and Turnbull route.”
The parties used the term “located,” in these contracts, in reference to the then existing state of things, which have been above detailed. The parties entered into the contract with the object, and from the motives, indicated by that existing state of things. Without engaging to locate its road upon this route, the Company could not obtain subscriptions of stock, with *588 which to build it through that portion of the county, as the other route was through a region of country, too poor to furnish the necessary subscription of stock for its construction; and without such an engagement-on the Company’s part, Isaac Jones would not become a subscriber for stock, since the location of the road upon this route only, could secure to his tract of land and forge the desired advantages, and enhance their value. A mere resolution of the Board of Directors of the Company, to locate its road upon this route, would never, without more, run a train of cars upon this route, and through the forge yard of Isaac Jones. It would never, therefore, without something more being done, secure to him the contemplated advantage, for which only, he, as the Company unquestionably knew, entered into the contract. Manifestly, then, the parties understood the term “locate,” to mean, something more than a mere resolution of a Board of Directors, that the road should be located upon this route. That something more was as clearly demonstrated, by the existing state of things, in reference to which the term “locate” was used, and the object and motives, with and from which, the parties entered into these agreements, that the road should be built and constructed on this route. In this view of the sense of the word “locate,” as used in these contracts, it becomes material to consider whether that term has acquired, in reference to the locating of railroads, an artificial or technical sense; for if it had acquired such technichal or artificial sense, the manifest intention of the parties was, in these agreements, *589 to use, and they did use it, in its common and popular sense, which was, when applied to the location of this part of the line of this railroad, to build and construct the road upon this stipulated route.
The portion of the charge, therefore, in which the jury were told, “if the term ‘locate" had, when used in reference to locating railroads, ácquired an artificial or technical sense; and if that sense were, the survey of a route, and its adoption by a resolution of the Board of Directors, as the line of the road, then the parties would be presumed to have used it in that sense,” was erroneous.
. There is, in one of these contracts, as we have seen, an express provision, that, unless the Company located, i. e., built and constructed its road upon the stipulated route, the subscription is to be void; and the provision in the other, to be paid, on condition that the road shall be located on that route, when taken in connection therewith, must — both being between the same parlies, as to the same subject-matter, and for the same purpose — be understood as in substance and effect, the same. In other words, the two papers are to be read, understood, and considered as one contract, as they were by the Court below. So viewed, the condition is annexed to the subscriptions themselves, which are, upon the non-performance, or upon the violation of the condition, to be void. The Company’s acceptance of these papers, bound it, so far, at least, as any right to regard or hold on to the estate of Isaac Jones, as one of its stockholders, and to. enforce the obligation of these contracts against him as a stockholder, *590 is construed, to build and construct the road upon the stipulated route; and upon its failure to enforce it, or violation of the condition, the subscription became void; all right of the Company against him, founded upon them, ceased; and then accrued to him the right to recover back the amounts of the calls he had previously paid, upon the faith of the Company’s obligation for the construction of the road on the agreed route. Such, no doubt, would, as shown by the passages quoted from Story and other authorities, be the rights of individuals, who had entered into an agreement with a like condition, which one of them had failed or refused to perform. There is no sound reason, why the rule in this respect, governing the contracts and fixing the rights of individuals/ should not apply to and govern the contracts of corporations with individuals, •and their rights, under such contracts, against individ-als, as well as the latter against them.
The rule that a member of a corporation is ordinarily bound by the acts of the major part of the corporation, or of its duly appointed organs, as a Board of Directors, when' done within the scope of its powers and purposes, does not constitute a reason why these rules of law, as to conditional contracts, should not equally apply to corporations and individuals, if corporations, like the present one, may accept conditional subscriptions to its stock, and consequently, conditional shareholders for members. For the conditional subscriber was either never a stockholder and member of the Company, if the condition was a precedent one and not performed, or ceased to be a stockholder and member, *591 on the violation of the condition, if the condition were a subsequent one, and violated after the payment of calls, or exercise, by the subscriber, of the right of a member; and the conditional subscriber, never having been a stockholder and member of the Company, or having ceased to be so on the violation of the condition, the rule of law mentioned has no application to him: 2 Parsons on Contracts, 10 to 12.
One party is bound, as well by the rule of moral right as of law, to keep or perform his contract with another in the sense in which he knew at the time of entering into it the other understood the contract: Chitty on Contracts, 62. There can be no doubt that the Company, when it entered into these contracts with Isaac Jones, knew that he understood them to make or continue him a stockholder of the Company, only upon the express condition that the Company should build or construct the road on the stipulated route, and only be bound on that condition, to perform them by the payment of calls. To suffer it then, under the plea of his being a stockholder, and bound by the action of the Board of Directors to change the location of th.e road, and still hold on to Isaac Jones’ subscription, and to him, as a stockholder, would be to sanction and sustain its direct and palpable violation of the terms of its own engagement. Indeed, it would be to permit the Company to practice a fraud upon him. The party who makes a representation upon wich another acts, is bound, both at law and equity, to make such representation good, and the same principle precludes a party from any right of recovery, when he has violated the *592 express condition of his contract with another. And clearly is this bo when the term “locate” means, as used in these contracts, to build and construct the road. It follows, that, so much of the charge as held the change of the line of the road did not release Isaac Jones from his subscription, was not the law of the case before the Court. So does it, that the action of the Court in overruling the demurrer of the defendants to the third and fourth replication of the plaintiff, and sustaining these replications.
The third and fourth pleas of the defendants set out the fact of the change of the route of the road from the stipulated route, and seek to recover the calls paid by the intestate, and by themselves, as administrators, as set-offs, in the nature of cross actions. The replication admits the fact of the change of route, but avers that when the plaintiff was about to begin the construction of that part of the road, it discovered a nearer, better and cheaper route for that part of the road, and adopted that new route, upon which, the road was in the course of construction. Then these replications contain an admission that the plaintiff had violated the condition, upon the performace of which, alone, the intestate was to become, or to remain, a stockholder, and bound to perform his part of the contract; and showed no valid ground of defense against the recovery sought in the pleas, if the result of the case should, in other respects, be such as would entitle the defendants to recover upon these pleas. The demurrers ought, therefore, to have been sustained, and (if the plaintiff had any good ground of defense against the pleas,) the plaintiff *593 permitted to avail itself of such other ground of defense, by sufficient replications.
The Court instructed the jury, that, inasmuch as the motive of Isaac Jones, for insisting upon the condition in the subscription agreement, as to the stipulated route, was to enhance the value of a tract owned by him; if the company, in good faith, intended to build the road according to the condition, and was doing what it could towards the accomplishment of that object, as far as it had the means to go, but before it had the ability to accomplish it, Jones died, and his heirs sold out, and parted with all interest in the land, and after they had sold out and denuded themselves of their interest, the company changed the location, though it would be a departure from the letter, it would not be from the spirit, of the contract, and would not operate to discharge Jones from the payment of his subscription.
The express and positive contract of the company and Isaac Jones, was, that unless the road was built and constructed upon the stipulated route, the subscription agreements should be void; but the Court makes for the company, and for the administrators of Jones, another contract, which is, that in the conceded event of the company having deliberately violated the positive condition of its express contract with their intestate, the company should be absolved from the obligations of its original contract, and from the legal consequences of such violation; because their intestate’s motive for insisting upon the condition, as to the stipulated route of the road, was the enhancement of the value of his tract of land; and because his heirs, who were not before the *594 Court,. had parted with their interest in the latid before the violation of the condition.
The original parties had not contracted, in any way, as to the recovery of damages for a violation of the condition. The express and positive condition' of their contract, was, that upon such violation, the subscription agreements themselves, should be void, leaving the law, in that event, to fix their respective rights agamst each other; and the well settled rules of law gave the administrators of Jones, in that event, the right to defeat any recovery against them upon the annulled contract, and also the right to recover what had been paid thereon, before the company avoided them. But the new contract made for them, denied them not only these rights, but any redress whatever for the admitted violations of the conditions of the contract. Both corporations and individuals have the legal right to make their own contracts, and Courts have no right to make- contracts for them. The function of the Court is to construe the contracts of parties, and when construed, and their meaning ascertained, to enforce them as made.
The correctness of this last proposition of the charge can only be sustained, by the assumption, by the Court, of the power, under the guise of cdSrstruing the.express and positive condition of the contracts of those parties, according to which the Court assumed, was its spirit to make a contract for the company and the administrators. This thing is not authorized eitheir by reason, principle, or authority. If there be. any case, in which proof of the sense of a term used in a contract may be admitted before a jury, and in. which a Court may leave *595 the question, as to the sense of the terms, to them, for decision, the present case was not that one. The words “locate,” and “location,” are terms which ha^e long been used in the land laws of this and other States, and have acquired, as used in those, laws, a fixed signification. So they have been used in regard to railroads, from the first introduction of this species of highways in England, and in this country; and if any question arises in a particular case, as to the sense of either of them, its sense must, by the Court, be gathered from its use,, as it learns and knows the sense of all other terms. It is not competent to admit evidence before a jury to prove its sense, whether it be common and popular, or. technical and artificial; and, if in this case, testimony for that purpose had been admitted, its admission would have been erroneous.
But the bill of exceptions discloses no such proof— and the points are only noticed to prevent the admission of incompetent evidence upon another trial, since the charge in the bill of exceptions would seem to indicate, that, in the Court’s opinion, such evidence was competent.
The judgment of the Court below will be reversed; and the cause remanded for another trial, according to the law of the case, as stated in this opinion.