Attaway v. The Third National Bank of St. Louis.

ATTAWAY *et al.* v. THE THIRD NATIONAL BANK OF ST. LOUIS *et al., Appellants.*

1. **Corporation**: DIRECTORS: IMMORAL CONTRACT. An agreement made by a director of a corporation, to use his vote and influence to the disadvantage of the corporation, and for the interest and benefit of third persons, is an immoral and corrupt contract, and will not be enforced.

2. ——— : ——— : ———. The law will leave the parties to such contract where they place themselves, not for the sake of the defendant, but for the law's sake and that only.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*J. R. Kinealy* for appellants.

(1) H. Attaway was an incompetent witness. (2) The oral agreement set up by him was never made. But, if made, it was void. *Atlee v. Fink*, 75 Mo. 100; *Oscarigon v. Arms Co.*, 103 U. S. 261; *Meguire v. Corwin*, 101 U. S. 107; *Bliss v. Matteson*, 45 N. Y. 22; *Bollman v. Loomis*, 41 Conn. 581; *Cash v. Gerrish*, 15 Pick. 49.

*Dyer, Lee & Ellis* for respondents.

BLACK, J.—The defendant bank had in its possession, at the commencement of this suit, a bond, executed by the Laclede & Fort Scott Railroad Company, for ten thousand dollars, dated December 2, 1879, due in three years, and payable to the order of the defendant, Kinealy. The plaintiff states that she is the owner of the half interest in the bond; that Kinealy is insolvent; that the bank threatens to deliver the bond to him, and she prays for an injunction. The answer of Kinealy, in substance,

is, that he acquired the bond from the Laclede & Fort Scott Railroad Company, for services as a lawyer, before that time rendered; that he made a written promise to transfer one-half of it to Julia F. Attaway, but that the writing was procured without any consideration therefor, and by what defendant characterizes as a blackmailing scheme on the part of Harrison Attaway, the husband of Julia F. Attaway. The trial court found the issues for plaintiff, awarded an injunction, and appointed a receiver to collect the money due upon the bond and divide the proceeds between the parties. This decree was affirmed in the court of appeals.

On the fifteenth of December, 1879, the defendant, Kinealy, gave to Harrison Attaway the following agreement: "I hereby promise and agree to transfer and deliver unto Mrs. Julia F. Attaway, one-half the proceeds of the ten thousand-dollar bond of the Laclede & Fort Scott Railroad Company, issued to me December 3, 1879, when the same are collected, less any amount paid to J. Z. Wigfall, and expenses.        M. KINEALY."

The important question in the case is, whether this agreement is valid, or whether it was a corrupt contract and without consideration. To understand the evidence, having a direct bearing upon this issue, it is essential to give a succinct history of the affairs which gave rise to the issuance of the bond, and they are as follows: The Laclede & Fort Scott Railroad Company was organized in 1860. From 1872 to the date of the judgment of ouster hereafter mentioned, there were two sets of directors, both claiming to have been legally elected. The one known as the Colehouse board had possession of the books and records. The company became wholly insolvent. Edward Burgess held a judgment against it for work done and materials furnished, amounting to nearly one hundred thousand dollars. In 1877, Burgess, Kinealy, and a few other persons, organized, under the general laws of this state, the St. Louis, Lebanon & Western

Railroad Company, with two hundred shares of stock. This company made a contract with the legal board of directors of the old company by which the new company was to acquire the property of the old, to assume the payment of the indebtedness to Burgess, and to go on and complete the road.   Kinealy became the attorney of the new company.   He also made a contract with it and Burgess by which he undertook to oust the Colehouse board, and get the rightful directors of the Laclede & Fort Scott Railroad Company in full control of the affairs of that corporation.   For these services Burgess agreed to give him one-fifth of the stock of the new company. Harrison Attaway was secretary and one of the legal directors of the Laclede & Fort Scott Railroad Company at this date ; he also became a director in the St. Louis, Lebanon & Western Railroad Company.

In February, 1878, Kinealy commenced a suit, at the relation of the circuit attorney and of Attaway, to oust the Colehouse board.   The proofs were all taken, and in May, 1878, Colehouse came to a settlement, by which the new company agreed to pay him a stipulated sum.   Thus the matters stood until in 1879, when this new company, the St. Louis, Lebanon & Western Railroad Company, failed to pay the stipulated sum to Colehouse, forfeited its agreement with the other company, the stock, of which Kinealy was to get a fifth, became worthless, and that company dropped out of existence from its own inherent weakness.   The directors of the Laclede & Fort Scott Railroad Company then desired Kinealy to prosecute the suit against Colehouse and others for them, but he declined to do it, unless they secured him a fee of ten thousand dollars for its successful prosecution.   This they at first refused to do, believing the amount to be exorbitant.   Finally, a contract for that amount was made, to be secured by bond and mortgage, and deposited for Kinealy on the successful determination of the suit.   Kinealy prosecuted the suit to

ouster of Colehouse and others, the judgment being entered a few days after the date of the bond, the eighth of December, 1879.

Mrs. Attaway testified that she carried on a hotel; that her husband was her agent in this bond matter; that she first knew of the bond in 1882; that she did not know of the agreement to transfer the half to her until two or three months before this trial. Harrison Attaway, in substance, testified: "Kinealy gave me the agreement for moneys I had expended for my wife in bringing the *quo-warranto* suit to a successful termination. He agreed, if I would assist in getting up the evidence, to pay me one-half the money he realized by the suit—one-half his fees. This agreement was made about the time the suit was brought. I spent five or six hundred dollars of my wife's money in defraying expenses. The first intimation I had that my wife's interest in the bond was a gift, was Kinealy's letter of May 3, 1882."

A number of witnesses, for the plaintiff, testified that Kinealy had, time and again, stated that Attaway owned half of the bond, and it is shown that, in 1882, he aided Attaway in an endeavor to sell the half interest. A number of Kinealy's letters to Attaway, written in 1882, were read in evidence; they speak of some unexplained transaction, but concede that Attaway owned half of the bond. In the letter of May 3, 1882, he says: "You speak of the money as being due to you. This is an incorrect way of putting it, as the matter was merely a gift, nothing having passed to me for it that I know of." A payment of two thousand dollars was made on the bond in March, 1882. Kinealy gave one thousand dollars of this to Attaway. A further payment was made in the following April, but this Kinealy refused to divide.

Kinealy flatly denies that he ever agreed to give Mrs. Attaway a one-half interest in the bond for the assistance of Attaway in the *quo-warranto* suit. From his and other evidence, it appears that Attaway was a

director of the Laclede & Fort Scott Company and secretary thereof, when the proposition of Kinealy to proceed with the suit came before it. That the board, as such, opposed the proposition. Mr. O'Bannon, one of the directors, says that Kinealy appeared before the board and wanted ten thousand dollars to proceed with the suit. The board were surprised, and appealed to Attaway, who was present, and said to him that he was the plaintiff and could go on with the suit. Attaway said Kinealy was playing the rascal, but they had better comply with his demand. He then denied being interested with Kinealy in the fee. It appears the board ordered the bond to be issued on the twenty-seventh of November, 1879, and it was then signed by the president, and the board adjourned. Kinealy testifies that Attaway came to his office before the records had been signed, and demanded a half interest, because of his trouble, and in order to get Attaway to attest the bond, he sat down and gave him the agreement to transfer the one-half interest to Attaway's wife, but he refused to insert the words, "value received," as requested by Attaway, and that Attaway then attested the bond. Says he was dissatisfied with the transaction, when Attaway said: "I will make it all right with you so you will get your money back. We are going to transfer the road to the St. Louis and San Francisco Railroad Company. Burgess will give me a large sum of money for my vote and influence, and Mr. Rogers has promised me five thousand dollars, and you will get your money back." Attaway then gave Kinealy the following agreement:

"St. Louis, December 15, 1879.

"I hereby promise and agree to transfer one-half of whatever amount I may receive from Mr. Edward Burgess, or the St. Louis & San Francisco Railroad Company, in connection with the transfer of the Laclede &

Fort Scott Railroad Company to the San Francisco Railroad Company.''

Attaway, in rebuttal, says he attested the bond on the third of December, 1879; that he did not go to Kinealy for the agreement until two weeks thereafter; that Kinealy then said they were both working together and he wanted a writing to show his interest in the Burgess claim, and that the two agreements were made at the same time, and after the bond had been fully executed; that Burgess had offered to give him all of the judgment that could be collected in excess of fifty thousand dollars. Mr. Rogers, of the St. Louis & San Francisco Railroad Company, being called by the defendant, says he never offered Attaway any money or property in connection with the then proposed transfer to that company; and Mr. Burgess being asked if he had made any such proposition, said: ''Not that I know of.''

It appears that, in 1880, the Laclede & Fort Scott Company made a contract with the Keystone Building Company, by which the latter was to receive all of the mortgage bonds of the railroad company, and for these bonds to go on and complete the railroad. Concannon, who had a part in procuring this contract, says he bound the building company to deliver to Kinealy thirty thousand dollars of these bonds. Kinealy says he represented the building company, as its attorney, and was to have a fee of thirteen thousand dollars for getting this contract. He appears to have been the attorney also of the railroad company at this time. He says Attaway refused to vote for the contract until he had secured ten thousand dollars of the bonds; and that, thereafter, Attaway worked and voted for the contract. When asked why he paid Attaway the one thousand dollars, he said it was necessary to keep Attaway on his side, and that Attaway had agreed that the bonds should not be issued until he, Kinealy, was pres-

ent, so as to get his share, but that Attaway let them be issued and sent to New York, without notice to him; and the intimation is that this led to the rupture between them.

From the conflicting evidence, and in the absence of a free and frank statement on either side, it is not easy to determine what are the real facts in this case. It is clear, we think, that the claim of the plaintiff that there was an agreement by Kinealy to share his fees with Attaway at the outset is unfounded. Until the St. Louis, Lebanon & Western Railroad Company ended its short career, there is no claim made that Kinealy was to receive any fee save the one-fifth of the stock of that corporation. Attaway never claimed any part of that; he assisted some in taking depositions, and so did the other directors, but they all had their claims for expenses allowed. Attaway does not show that he was at any expense, not thus allowed by the directors of that company. The fact that Mrs. Attaway knew nothing of the bond until long after it was issued, and indeed not until this trouble arose, though she claims it because of the expenditure of her money, is of some significance. The circumstances are all opposed to the existence of any such contract from the beginning; and we conclude whatever arrangement there was between them arose after the new corporation dropped out of the controversy.

The effort of Kinealy to show that he was forced to give Attaway the agreement for one-half of the bond by a sort of duress is not entitled to any consideration. It has all the appearance of a sham. It is clear, too, that the two agreements were made, not when the bond was attested, but on the fifteenth of December thereafter; this conclusion conforms to the dates of those papers, and circumstances, even of a slight character, must outweigh the conflicting statements of the parties. The consideration for the agreement of Kinealy to give Mrs.

Attaway one-half of the bond must stand on the agreement of Attaway to share in what sum the latter might receive from Burgess. Burgess' deposition, consisting of a few words, before given, is not satisfactory, one way or the other. It may be that Attaway had an arrangement with him by which Attaway was to get a compensation for his vote and influence in the proposed transfer of the Laclede and Fort Scott Railroad Company to the St. Louis & San Francisco Railroad Company. We find nothing in the record to justify the conclusion that he was to get a cent for any other service. Attaway owed loyalty to the company of which he was director, and such a contract would be a corrupt one. Attaway had an interest in the contract with the Keystone Building Company, and this in utter disregard of his position. His wife seems to have been interested in other sub-contracts. The defendant, though attorney for the railroad company, engaged with the building company for a large fee, to be paid in bonds of the company. The disposition on both sides to disregard confidential relations stands prominent throughout this record. We can but conclude this agreement, which it is sought to enforce, and the other one given by Attaway to the defendant, the one being the consideration for the other, were but agreements to share proceeds arising from the use of Attaway's influence as a director. The circumstances all tend to show that the agreement arose, though not then put in writing, when the bond in question was asked as a compensation for prosecuting the *quo-warranto* suit. Attaway could have proceeded with that suit without the consent of Kinealy, but he chose to assert that he could not, though he was the relator and the suit was also prosecuted in the name of the circuit attorney.

An agreement of a director of a corporation to use his vote and influence to the disadvantage of the corporation, and in the interest and for the benefit of third

persons, is an immoral and corrupt contract. Such contracts will not 'be enforced. The law will leave the parties where they place themselves, not for the sake of the defendant, but for the law's sake, and that only. *Altee v. Fink*, 75 Mo. 100; *Bent v. Priest*, 86 Mo. 476; *Bliss v. Matterson*, 45 N. Y. 22; *Tobey v. Robinson*, 99 Ill. 223; *Harrington v. Victoria Graving Dock Co.*, 47 Law Jour. (N. S.) 594.

It results that the judgment must be reversed and the suit dismissed. It is so ordered. All concur.