## L. K. McGUFFIN v. COYLE AND GUSS.

### (Filed January 6, 1906.)

1. PRACTICE—Action on Promissory Note—Demurrer to Evidence Sustained, When. Where a cause of action is founded alone on a promissory note, and where, from the wording of the note, when construed in the light of all the evidence in the case, it appears that it is one on which no cause of action could be maintained, and, where the language of the note and all the evidence in the case clearly shows that it is against public policy, a demurrer to the evidence should be sustained, and this cannot be cured by a defect in the pleadings.

2. PROMISSORY NOTE—Presumption as to Payee. Where a note is made payable to a certain person or persons named as payee therein, and there is nothing in the wording of the note to indicate, and no showing in the evidence, that any other person has any interest therein, the presumption will be that the note is for the personal benefit of the payee named therein.

3. SAME—Void, When—Public Policy—Railway Companies. When a note is made payable to a director or officer of a railroad company, in his personal capacity, and for his personal benefit, on condition that a railroad is built to a certain point, by a certain time, such note is void as against public policy, and no recovery can be had thereon.

(Syllabus by the Court.)

*Error from the District Court of Payne County; before John H. Burford, Trial Dudge.*

*Chas. E. Bush* and *Jno. Devereux,* for plaintiff in error.

*Henry E. Asp, Charles H. Woods* and *Geo. M. Green,* for defendants in error.

### STATEMENT OF FACTS.

This action was commenced in the district court of Payne county, Oklahoma Territory, by W. H. Coyle, and U. C. Guss, partners under the firm name and style of Coyle & Guss, against L. K. McGuffin, on a promise to pay two hundred and fifty dollars when the Atchison, Topeka & Santa Fe Railroad Company should build its road into the town of Cushing, Oklahoma Territory. The petition is as follows, omitting the caption:

"Comes now the above named plaintiffs and complain of the above named defendant, L. K. McGuffin, and for cause of action against said defendant, allege and say: That the said defendant on the 23rd day of July, 1901, for a valuable consideration, executed and delivered to the plaintiffs his certain promissory note in writing, of that date, whereby said defendant promised to pay to the order of the said plaintiffs on July 1st, 1902, the sum of two hundred and fifty dollars ($250.00) at Cushing Bank Cushing Oklahoma.

"That said note was executed and delivered by defendant to the plaintiffs on condition that the Santa Fe Railroad (meaning thereby the Atchison, Topeka & Santa Fe Railroad) should be built to the town of Cushing by July 1st, 1902. Plaintiffs allege that the said condition in said note has been fulfilled and performed in every particular. and that the said railroad was built to the said town of Cushing prior to July, 1st, 1902.

"That said railroad was fully equipped for the operation of trains, and provided with all the necessary facilities for the transportation of passengers and freight, and that the regular trains were out in operation on said railroad to the town of Cushing prior to July 1st, 1902.

"Plaintiffs allege that they are the owners and holders of said promissory note, and that there is now due them on said note from said defendant the sum of two hundred and fifty dollars with interest thereon at the rate of seven per cent per annum from the 1st day of July, 1902, and that the defendant although often requested has failed and refused to pay the same. A copy of said note is hereto attached, referred to herein, and made a part of this petition, and marked 'Exhibit A.'

"Wherefore, plaintiff prays judgment against said defendant L. K. McGuffin for the sum of two hundred and fifty dollars with interest at the rate of seven per cent. per annum from the 1st day of July, 1902, and for the costs of this action.

"HENRY E. ASP,
"J. R. COTTINGHAM,
"J. B. FURRY."

The note referred to in the petition as "Exhibit A" is as follows:

Cushing, Okla., 7-23 day, 1901.

"$250.00

"July 1st, 1902, If Santa Fe R. R. is built to Cushing by this date, (July 1-1902) A. T. & S. F. R. R. to Cushing Oklahoma, in consideration of its being built for value received, as principals promise to pay to the order of Coyle & Guss, two hundred and fifty ............ dollars, at Cushing Bank, Cushing, Oklahoma. This note is given upon condition that a failure to comply with the above requirements shall render this note void.

"L. K. McGUFFIN.

"Exhibit A."

To this petition defendant demurred, which demurrer was overruled, to which defendant excepted. Defendant then filed an answer setting up failure of consideration, and fraud in obtaining said note. ·The following evidence was introduced on the part of the plaintiff. 1st, the charter of the Eastern Okahoma Railroad Company. Then evidence was introduced showing that the Atchison, Topeka & Santa Fe Railroad Company was the principal stockholder in the Eastern Oklahoma railroad, and that the stock subscribed by the different stockholders in the Eastern Oklahoma Railroad Company, was at the request of the Atchison, Topeka & Santa Fe Railroad Company, and that the Atchison, Topeka & Santa Fe Railroad Company purchased the right of way, and that the Eastern Oklahoma was completed to Cushing within the time designated in the note. The defendant demurred to this evidence, which was overruled by the court, and judgment given for the plaintiff, to which the defendant excepted. Motion for new trial was made in due time, filed, argued, overruled and exceptions saved. To all of which the defendant excepted, and brings the case here for review.

Opinion of the court by

IRWIN, J.: Plaintiff in error insists that this case should be reversed on three grounds: First, that the evidence shows that U. C. Guss, one of the plaintiffs, was a stockholder in the Eastern Oklahoma Railroad Company, and any contract by which he was to receive a personal benefit for the location of that road at a certain point, was against public policy, and void; second, because the evidence fails to show that the Atchison, Topeka & Santa Fe Railroad Company has ever built a railroad to Cushing and there-

fore, the condition on which the note was to be paid has never been fulfilled; and third, because the petition fails to show any consideration for the promise.

Counsel for defendant in error, insist that this demurrer to the petition should have been overruled, because the pleadings did not raise the question of the legality of the note in question, and they cite a number of authorities to sustain this position. But we think this position is not tenable, because we believe the true rule to be that where a cause of action is founded alone on a promissory note, and where, from the wording of the note, in the light of all the evidence in the case it appears that the note is one on which no cause of action could be maintained, and, where the language of the note, and all the evidence in the case clearly shows that it is against public policy, a demurrer to the evidence should be sustained, and this cannot be cured by a defect in the pleadings. Such seems to be the holding of the United States supreme court in the case of *Oscanyan v. Arms Company,* 103 U. S. 261-266, where that court say:

"The position of the plaintiff that the illegality of the contract in suit cannot be noticed, because not affirmatively pleaded, does not strike us as having much weight. We should not deem it worthy of serious consideration had it not been earnestly impressed upon our attention by learned counsel. The theory upon which the action proceeds is that the plaintiff has a contract, valid in law, for certain services. Whatever shows the invalidity of the contract, shows that in fact, no such contract as alleged, ever existed. The general denial under the code of procedure of New York, or the general issue at common law, is therefore, sustained by proof of the invalidity of the transaction which is designated in the complaint or declaration as a contract."

Further in the opinion, at page 267, the court says:

"Here the action is upon a contract, which, according to the view of the judge who tried the case, was a corrupt one, forbidden by morality and public policy. We shall hereafter examine into the correctness of this view. Assuming for the present, that it was a sound one, the objection to a recovery could not be obviated or waived by any system of pleading, or even by the express stipulation of the parties. It was one which the court itself was bound to raise in the interest of the due administration of justice. The court will not listen to claims founded on services rendered in violation of common decency, public morality, or the law. History furnishes instances of robbery, arson, and other crimes committed for hire. If, after receiving a pardon, or suffering the punishment imposed upon him, the culprit should sue the instigator of the crime for the promised reward,—if we may suppose that audacity could go so far,—the court would not hesitate a moment in dismissing his case, and send him from its presence, whatever might be the character of the defense. It would not be restrained by defects of pleadings, nor indeed, could it be by the defendant's waiver, if we may suppose that in such a matter it would be offered. What is so obvious in a case of such aggravated criminality as the one supposed, is equally true in all cases where the services for which compensation is claimed are forbidden by law, or condemned by public decency or morality."

And in the case of *Coppell v. Hall,* reported in the 7th Wallace, page 542, the supreme court of the United States again says, in the opinion, on page 558.

"The instruction given to the jury, that if the contract was illegal, the illegality had been waived by the reconventional demand of the defendant, was founded upon a misconception of the law. In such cases, there can be no waiver. The defense is allowed, not for the sake of the defendant, but of the law itself. The principle is indispensable to the

purity of its administration. It will not enforce what it has forbidden and denounced. The maxim, *Ex dolo malo non oritur actio,* is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. On stipulation in the most solemn form to waive the objection, would be tainted with the vices of the original contract, and void for the same reasons. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation."

Counsel for defendant in error in their brief, say as to the first ground for a reversal argued by counsel for plaintiff in error:

"It is submitted, that, upon this point, the only answer that is necessary, is, that the record discloses that there is not a scrap of evidence from which even an intimation might be drawn that any personal benefit accrued to Guss through this particular transaction. It is true that Guss was one of the stockholders of the company, and also that he is named as one of the payees of the note; that there is not an iota of evidence to show that he was to receive this money in his personal capacity and for his personal benefit; and certainly none to the effect that he was to receive it for his personal benefit at the expense of the company for which he was working, and to which he owed his duty."

Now, by the use of this language in their brief, it would seem that *non-constat,* if the evidence did show that the note was for the personal benefit of Guss, and that he was one of the stockholders of the company, and that the said note was for his personal benefit, given to him in his personal capacity, their views would be different. Counsel

for defendant in error insist and base their defense entirely upon the proposition that the note in question is a subscription note entered into on behalf of, and for the benefit of the railroad company, intended to aid it in the construction of its road.   And they insist that such a contract entered into by, or on behalf of the railroad company, looking toward its location at one point rather than another is not void, or against public policy, or that the public is necessarily affected to its detriment by such contract, and they say this is especially true in Oklahoma, where by statute railroad companies are permitted to hold real estate; to take and hold such voluntary grants of real estate and other property either within or without this Territory, as may be made to them, to aid in the construction, maintenance and accommodation of their railroad.   This point in the argument of counsel for defendant in error, will be considered later on in this opinion.

From a careful examination of the brief of the defendants in error, it will be seen that their claim that this note is valid and not in contravention of public policy, is based entirely upon the theory that this is a subscription note, and while by its terms, it purports to be given to Coyle & Guss, it is in fact given for the benefit of the railroad company, and not to Coyle & Guss in their individual or partnership capacity, nor for their personal benefit, or for the benefit of either of them.   That the real beneficiary of the note is the railroad company, and not Coyle & Guss, or U. C. Guss. Thus it will be seen that in deciding this case we are at the very outset confronted by two propositions—two questions upon the answers to which the ultimate decision of this case rests, when to these answers is applied the correct principles of law.   The first question is: To whom is this note actually given? And second: Who is the beneficiary thereof?

In determining these questons, we must be governed entirely by the plain language employed in drawing up the note in question. Where language is plain and unambiguous, and no uncertain terms are used, we take it that the ordinary and commonly accepted meaning of the words is intended. Now a reading of this note shows that so far as the promise of the payment of money goes, it is in the ordinary form of a promissory note, and is made payable to Coyle & Guss, and we have made a very careful examination of the entire note, and we can find no language in it which by any reasonable construction can be interpreted to mean that any other person or persons was intended by the maker of the note to have any benefit therefrom. Coyle & Guss are made the payees of the note without any qualifications, or without attaching any conditions that the proceeds of the note are for the benefit of anybody else. So far as defining the payees of the note, the statements of the note are unqualified, and there is certainly nothing in the note itself which would indicate that Coyle & Guss, or either of them, were acting in the interests of anybody else, as agent or otherwise. Then, if nothing in the note indicates that Coyle & Guss are not the real payees and beneficiaries, there is only one place for us to look for the evidence of such intention, and that is to the evidence in this case. We have read and re-read this evidence, and we fail to find a word or a syllable which to any degree, or to any extent indicates that Coyle & Guss took this note as the agent of the Atchison, Topeka & Santa Fe Railroad Company, or any other railroad company or corporation, or took it in any other capacity than their individual capacity as the firm of Coyle & Guss. When we refer to this evidence, we find first, that the charter of the Eastern Oklahoma Railroad was the first evidence, and in

that it states that U. C. Guss, one of the payees of this note, was a stockholder in the Eastern Oklahoma Railroad Company and a director therein. The only other testimony is that of Henry E. Asp, attorney for the Atchison, Topeka & Santa Fe Railroad Company; and the only testimony given by him concerning the payees of this note, is found on page 23 of the case made, where it says that Guss signed the articles of incorporation of the Eastern Oklahoma Railroad Company, and was a subscriber for one share of stock, and that he, Guss, signed the articles of incorporation and became a member of the corporation at the request of him, the said Asp, and the witness says he thinks Guss had some talk with the officers of the Atchison, Topeka & Santa Fe Railroad Company in Chicago concerning the matter; and on page 25, the same witness testified that he made a contract with Coyle & Guss to procure the right of way, and that the Atchison, Topeka & Santa Fe Railroad Company paid for the same. Now this is the entire evidence on this point. No other evidence of any kind or character is introduced touching this point. Now can it be said that the mere fact that Guss subscribed for stock in the Eastern Oklahoma Railroad Company at the request of the Atchison, Topeka & Santa Fe Railroad Company, and that he was employed for the purpose of assisting in procuring the right of way for that railroad company, is sufficient in itself to authorize the court in holding that this note was given to the railroad company, and not to Guss, and that the same is not for Guss' personal benefit, in the face of the plain unequivocal language of the note itself. Plaintiffs in the court below, in their petition filed in this case, and on which this case is based, offer this note, not as the note of the railroad company, but as the personal prop-

erty of Coyle & Guss. Coyle & Guss are the plaintiffs in the case. No one else is mentioned as plaintiff, and in the petition, this language is used: "Plaintiffs allege that they are the owners and holders of said promissory note, and that there is now due them on said note the sum of two hundred and fifty dollars, ($250.00) with interest thereon * * *".

Now we take the true rule of law to be that where a note is made payable to a certain person or persons as payee therein, and there is nothing in the wording of the note to indicate, and no showing in the evidence that any other person has any interest therein, the presumption will be that the note is for the personal benefit of the payee named therein.

We think, from the unmistakable language of the instrument itself, in the absence of any evidence to vary, change or explain that language, any reasonable fair minded person must come to but one conclusion from a reading of the note, and that is, that it is the personal property of Coyle & Guss, and for their personal benefit. They might, it seems to us, as consistently and just as reasonably say that it was for the benefit of the Cushing Bank, of Cushing, Oklahoma because that bank is named as the place of payment in the body of the note, as to say that it was a note given to the Atchison, Topeka & Santa Fe Railroad Company. Before we could indulge in the presumption that this note did not intend or mean what it plainly and unmistakably says, we should have something to base such a presumption on. That presumption could only be based upon something in the language of the note itself, or from something in the evidence in the case. This case is brought in the district court in the name of Coyle & Guss, in the individual capacity of the firm. In their petition they allege that they are the owners and hold-

ers of this note. Nowhere in the petition is any allegation made that any other person or persons has any interest directly, or indirectly therein. We have before us all the evidence that was before the district court. On the evidence introduced before the district court could any other or different judgment have been rendered, provided the note was otherwise unobjectionable, than a judgment in favor of Coyle & Guss? Would the district court have been warranted on that evidence in finding that any other person or corporation had any interest in this note? If it would not, then why should we, on the same evidence, be authorized in making such finding? This note is payable by its terms to Coyle & Guss, or order. Now let us for a moment consider the attitude of the Atchison, Topeka & Santa Fe Railroad Company, provided they are the real beneficiary of this note, and that the note was made in the name of Coyle & Guss for their benefit. There is no way known to the law by which they could get what justly belongs to them out of the proceeds of this judgment except upon an order from Coyle & Guss. Would it be likely that a great business concern, like the Atchison, Topeka & Santa Fe Railroad Company would do business in this precarious, unsafe, and uncertain manner? If this note was really given for the benefit of the Atchison, Topeka & Santa Fe Railroad Company, and was not intended for the personal benefit of Coyle & Guss, then what consistent reason can be given for the note being taken in the name of Coyle & Guss, without any language therein to preserve, or protect the rights of the railroad company? Is there any prohibition in law that would prevent the railroad company from taking notes and contracts for their own benefit in their own name? Have we any right under the evi-

dence to indulge in a presumption which neither the instrument itself, nor the evidence in the case would warrant? Then again, if this note was intended to be for the benefit of the railroad company, why should they take and use as one of the payees of the note, Coyle, who so far as this record shows, has no connection with the Santa Fe Railroad Company, save and except that he was employed at one time to assist in the purchase of right of way for the railroad? Then again, it would seem to us that this note would not have been intended to be a note given either for the purpose of assisting in the procuring of the right of way, or to aid in the construction of the railroad, because by the terms of the note, it is not payable until both these conditions have been performed because it is not payable to anybody until the road is built to Cushing. Now it is a self evident fact that the purchase of the right of way must be a condition precedent to the construction of the railroad, and it is a fact made manifest by the language of the note, that the construction of the road is a condition precedent to anything being due on the note. This, it seems to us, is a complete answer to the proposition that this is a subscription note given to the Atchison, Topeka & Santa Fe Railroad Company, to aid in the construction of its railroad. And it seems that the only reasonable construction that can be placed upon the note and the evidence in support thereof is that it is the property of Coyle & Guss, in their individual capacity, and for their personal benefit.

As to the second proposition urged by plaintiff in error for a reversal of this case, attorneys for defendant in error say in their brief at page 5:

"But the argument of counsel is that the fact that this was a contract of subscription with Guss and Coyle for the location of a railroad at a certain point; that Guss was one of the directors of that railroad company, is enough in itself to render this contract void on the ground of public policy. And this, in view of the fact that there was not a jot of evidence to contradict the evidence of the plaintiff that in acting in these right of way matters Guss & Coyle acted for and in behalf of the railroad company.

We have examined the brief of counsel for plaintiff in error carefully, with a view to ascertain if this was their argument, and we think that this statement in the brief of counsel for defendant in error is not warranted. We have heretofore given our view of the evidence as to this note being the individual and personal property of Guss and Coyle.

Counsel for plaintiff in error in their brief, insist all through the brief, that it is not a subscription contract with the company, but is a note given to Coyle and Guss for their personal benefit. On page 5 of plaintiff in error's brief, they say:

"Any contract by which he, (meaning Guss) was to receive a benefit personally for the location of that road was against public policy and void."

Nor, do we find anything in the evidence that would warrant the conclusion that this note was a subscription note to the company, but counsel for defendant in error say on page 5 of their brief:

"There was not a jot of evidence to contradict the evidence of the plaintiff, that in acting in these right of way matters, Guss and Coyle acted for and in behalf of the railroad company."

We cannot understand the purpose of this statement, or what possible significance it can have in this case for the reason that there is absolutely nothing in the note itself which in any way indicates or has any connection, however slight, with the subject of the buying of the right of way, and we have repeatedly read this entire evidence from beginning to end, and there is not a scintilla of evidence that in any way connects this note with the purchase of the right of way, or even indicates or hints that it has any reference to that subject. Hence, we think that there is no force in the statement of counsel for defendant in error that the evidence does not tend to contradict the evidence of plaintiff that they were acting in right of way matters for the Santa Fe railroad company, because it is immaterial whether they were, or were not, unless in some way this note is connected with the subject of the right of way; and, as we have heretofore said, from the wording of the note itself, it must be evident that this note was not intended as an aid to the purchase of the right of way.

As to the contention of counsel for defendant in error that not every contract entered into by, or on behalf of a railroad company looking towards its location at one point rather than another is void, we have this to say: That many respectable authorities are cited by counsel to sustain this position, among which is the case of *McClure v. The Gulf Railroad Company*, 9 Kas. 373; *Railroad Co. v. Rank* 9 Watts (Pa.) 458; *Berryman v. Trustees Cincinnati Southern Railway*, 14 Bush (Ky.) 755; *Racine County Bank v. Ayers*, 12 Wis. 570, and *Bank v. Hendrie*, 49 Ia. 402. And on an examination of these authorities, it would seem that most if not all, of them sustain that position. But on the contrary,

we are cited to a line of respectable authorities which seems
to hold the contrary doctrine.   But, under our view of this
case, so far as presented by the record, this question does not
arise in this case, and we are inclined to the belief that "Suf-
ficient unto the day is the evil thereof" and will content our-
selves with a discussion and decision of those questions only
which are germane to the issues of this case.   When the ques-
tion of the right of the railroad company to take notes or
contracts of subscriptions for the construction of their road,
conditioned upon the location thereof at a certain point rather
than at another point, comes to us upon the issues involved in
the case, it will be time enough to decide that question, but
at present we do not deem it necessary, or advisable to try
to reconcile what seems to be a conflict of authorities on this
proposition.   We think the true principle of law is, that a
note made payable to an officer of a railroad company, in his
personal capacity, and for his personal benefit, on condition
that a road is built on a certain line, to a certain point, by
certain time, is void as against public policy, and that no
recovery can be had thereon.

In the case of *Eldred v. Malloy*, 2 Colo. 320, in passing
upon the validity of a note almost identical in terms with
the one in this case, the note there under consideration read-
ing as follows:

"Golden City, Col. Ter., May 20, 1870.

"Nine months after date, for value received, I promise
to pay J. A. Remington, or order, Five hundred dollars,
without defalcation or discount, at Golden City, Colorado.
The consideration of the above is that if the railroad is com-
pleted and cars running to a point inside the Table Moun-
tains, at Golden City, Colorado Territory, on or before 20th
of February, A. D. 1871, the above sum will be duly paid to

the before mentioned J. C. Remington; otherwise, the obligation to be null and void.

"STEPHEN ELDRED,"

The court speaking through Judge Belford, said:

"Notwithstanding the fact that contracts of wager have been regarded as valid at common law, a disposition has been steadily growing in all respectable courts to discountenance and ignore them. It is generally conceded that the principle was engrafted on that system at a time when but little consideration was given to the subject, and the right to recover in such cases, quite fully established before any searching inquiries were made into the moral tendencies of the doctrine. While bowing to the authority of Lord Mansfield, such able jurists as Ellenborough and Campbell and LeBlanc, have declined to entertain such cases, while other judges have refused to proceed as long as anything else could be found to do, constantly declaring that were the question a new one, the rule would be different.

"The manifest disfavor extended to these contracts by the English judges, and the unremitting efforts that are being made to get rid of a rule established through the inadvertency of their predecessors convinces me that in upholding these contracts, the earlier decisions were founded on a misapprehension of the common law.

"The courts of this territory have enough to do without devoting their time to the solution of questions arising out of idle bets made on dog and cock fights, horse races, the speed of ox trains, the construction of railroads, the number on a dice, or the character of a card that may be turned up."

And that court there reversed the finding and judgment of the district court, and held such a note to be void, without remanding the case, holding that no recovery could be had, and ordered the costs taxed to the plaintiff in the court below.

But for the purpose of this case, it will not be necessary to follow the Colorado court to the extent which they have gone, as this decision seems to be at variance with almost all the English, and a great many of the American cases, and it is not necessary to put this note in the category of a wager. It is sufficient that this note, upon its face, shows that it was given to a stockholder and director of the railroad company, and by its form such stockholder and director is to receive the benefit for the location and construction of a railroad at a certain point.    And this court in a case recently before it, involving to some extent the same principle as the case at bar, being case No. 1570, *Enid Right of Way and Townsite Company v. Lile,* said:

"That a railroad company chartered by authority of law is a *quasi* public corporation, and the public have an interest in the location of their lines of road and depots.    That in the discharge of this duty to the public, said railroad should recognize it as a paramount duty to establish and maintain their depots at such points, and in such manner as to best subserve the public necessities and conveniences. We take it to be the policy of the law that a railroad company charged with this duty occupies a trust relation with the public to the extent of fairly, freely, and honestly discharging that duty to the best interests of the public, and any contract which has a tendency to limit or restrict the action of the railroad company in the discharge of that duty, is against public policy.    That the location and establishing of its lines and the location and establishing of railroad stations and depots is a duty which it owes to the public."

And while, in that case (reported in 15 Okla. 317) a little different state of facts existed, as that note was given to the Enid Right of Way and Townsite Company, conditioned that a depot or station on the Denver, Enid & Gulf

Railroad should be located at a certain point, still the principle is practically the same, and this court in the opinion, said:

"Now this is a contract, not with an officer of the Denver Enid & Gulf Railroad, but with another person, to wit: The Enid Right of Way and Townsite Company. It is reasonable to presume that the maker of this note supposed that the Right of Way and Townsite Company had some influence with the railroad company, and it provided for the location of this depot by the railroad company. Hence we fail to see why it does not fall clearly within the class of cases first cited in the brief of plaintiff in error, which they admit, and cite authorities to prove, that if it does fall within that class of cases it is void as against public policy."

The court further on in the opinion, says:

"We think that one of the strong reasons why contracts of this character are against public policy is because of their corrupt tendencies, whether by lawful, or unlawful means, to prevent the free exercise of discretion by the railroad company in locating their railroad stations and depots for the best interests of the public and the interests of the people. The law in its wisdom we think has a tendency to close the door of temptation by refusing to recognize contracts which in any way hamper the faithful discharge of the trust which the railroad company owes to the people in the location of public conveniences. Directors of railroad corporations occupy a two fold relationship: First, to the stockholders of the road, and second, with the public. They will not be permitted on the one hand to enter into contracts for their own pecuniary gain. Neither will they be permitted to compel payment from the people for doing that which the law requires them to do. Under the law, the directors of the Denver, Enid & Gulf Railroad Company were required to establish and maintain their stations and depots wherever the public interests and conveniences would be best subserved.

and the rule, we take it, is elementary, that the performance of an act which the party is under legal obligations to perform, cannot constitute a valid consideration for a promise.* * *

"We think the policy of the law is decidedly against the enforcement of contracts which permit those entrusted with the discharge of a public duty to exact tribute from the people for doing that which the law required them to do. If such contracts were enforceable, the building of every new railroad through this Territory would subject the officers of that railroad to the temptations of every mercenary person who had some selfish motive for the location of all the depots and railroad stations along the line, for the benefit of their own private interests, and to carry out this, selfish designers would enter into contracts of pecuniary advantage to any officer who might have in charge the duty of locating such public conveniences, and the question of the best interests of the public would be lost sight of in the great individual struggle to locate such conveniences for private, and not public benefit. Hence, we think that the only safe doctrine is to hold that any contract either with a railroad corporation, or with any person presumed to have influence with such corporation, whereby such corporations are to be limited, restricted, or hampered in the faithful discharge of their duty to the public in the way of locating railroad stations and depots along its line, are things to be held not enforceable in the courts."

In the case of the *Woodstock Iron Co. v. Richmond & Danville Extension Co.,* 129 U. S. 643, the question was whether an agreement with the plaintiff in error to pay the defendant in error thirty thousand dollars to build a railroad by its works which would make the railroad about five miles longer, was valid. In that case it is held that agreements upon pecuniary considerations or the promise of them to influence the conduct of officers charged with duties af-

fecting the public interest, or with duties of a fiduciary capacity to private parties, are against the true policy of the state which is to secure fidelity in the discharge of all such duties, and are void. In the opinion in that case, on page 662 the supreme court of the United States after reviewing the authorities presented, uses this language:

"There is no exception in any decision called to our attention as to the character of a contract when for a pecuniary consideration, directors, stockholders, or agents of a company undertake to influence its conduct in these matters. Indeed the law in general that agreements upon pecuniary considerations, or the promise of them, to influence the conduct of officers charged with duties affecting the public interests, or with duties of a fiduciary character to private parties, are against the true policy of the state, which is to secure fidelity in the discharge of all such duties. Agreements of that character introduce mercenary considerations to control the conduct of parties instead of considerations arising from the nature of their duties, and the most efficient way of discharging them. They are, therefore, necessarily corrupt in their tendencies."

In the case of Tool Co. v. Norris 2 Wall. 48-56, the supreme court of the United States say:

"That all agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointment of public officers, or the ordinary course of legislation, are void as against public policy, with reference to the question whether improper means are contemplated or used in their execution."

It will be noticed that in these cases the grounds upon which these decisions are rendered are not that the proof shows that any interests of the public have been jeopardized, or any injury has been done, but on the ground of the corrupt

and improper tendency of such contracts—not on what has been done, so much as what might be done—the probability of such contracts tending to the injury of the public. In support of this, we call attention to the language of the supreme court of the United States in the case above cited, *Woodstock Iron Co. v. Extension Co.,* 129 U. S. 643-661 where it is said:

"If, as a third contingency, the choice lay between this line, and another equally good, but not better, and they were influenced by this contract to adopt this line, then, although neither the company nor the public has been injured, yet the defendants have made their official power an instrument of private emolument in a manner which no court of equity can sanction. In this particular case no wrong may have been done, and yet public policy plainly forbids the sanction of such contracts, because of the great temptation it would offer to official faithlessness and corruption."

In the case of *Linder v. Carpenter,* 62 Ill. 309, the supreme court of that state say in the syllabus:

"A contract made with officers of a railroad company, acting in their individual capacity, to induce them to establish the line of the road at a certain point, for the purpose of promoting the private advantage of the contracting parties, is against public policy, as tending to sacrifice the interests of the stockholders, and the public, and will not be enforced in equity."

The same doctrine is held in the case of *Bester et al. v. Wathen et al.,* 60 Ill. 138, and the court in the body of the opinion at pages 140, and 141, uses this language:

"On this question there is slight room for doubt. When the people through the legislature, grants to a company the right of eminent domain for the purpose of constructing a railway, the grant is made because it is sup-

posed the road will bring certain benefits to the public. When the company is incorporated, the subscriptions are made to the stock, the money is subscribed upon the understanding that the officers intrusted with the construction of the road will so locate its line and establish its depots as to bring the highest pecuniary profit to the stockholders, compatible with a proper regard to the public conveniences. These, and these alone, are the considerations which should control the actions of the president and directors of the road, and so far as they permit their official actions to be swayed by their private interests, they are guilty of a breach towards the stockholders, and of a breach of duty to the public at large."

In the case of *Holliday v. Patterson,* reported in the 5th Oregon, at page 177, that court says in the syllabus.

"*A Contract to Donate Money to Secure the Location of a depot is void.* H., being a director and president of the Oregon & California railroad company, and the owner of a controlling interest in the stock of said company, agreed with P., that in consideration of a certain sum of money, he would cause the line of said road to be located on a certain route, and a depot to be built at a certain place, instead of adopting another route then surveyed, which was shorter, and over which said road could be constructed at less expense: *Held,* that such a contract is contrary to public policy."

And in the body of the opinion, at page 180, the court there says:

" 'Public Policy' is a vague expression, and few cases can arise in which its application cannot be disputed. Mr. Story, in his work on Contracts, sec. 546, says: 'It has never been defined by the courts, but has been left loose and free of definition in the same manner as fraud. This rule, however, may be safely laid down. that wherever any contract

conflicts with the morals of the times, and contravenes any established interests of society, it is void as being against public policy.' In illustration of this rule, he says sec. 576; 'When therefore, a person occupying a public office agrees for a reward to exercise his official influence in questions affecting both public and private rights, so as to bring about the private advantage of persons interested, the contract would be void. For every public officer is bound to be disinterested in the consideration of all public questions, and any contract which interferes with the free and unbiased exercise of his judgment in relation to a question of trust and confidence reposed in him, is against public policy and good morals."

"Railroad companies are defined to be *quasi* public corporations, and the directors act in a double capacity to-wit, as the agents for the company, and also as trustees for the public, clothed with an important public trust. 1 Redfield on Railways, 577, sec. 140, says: The general duty of railway directors is an important and a public trust, and whether undertaken for a compensation or gratuitously, imposes a duty of faithfulness, diligence, and truthfulness in discharge of its functions, in proportion to its difficulty and responsibility."

"It is, among other things, argued that this contract is not against public policy, because contrary to public interest, as the deflection of the line of the road from the more direct route of the original survey would best subserve the public interests, and promote the welfare of the community through which the road passes. The question of the validity of the contract does not, however, depend upon the circumstances whether it can be shown that the public has in fact, suffered any detriment, but whether the contract is, in its nature, such as might have been injurious to the public."

In the case of *Elkhart County Lodge, et al. v. Crary*. cited in the 98 Ind. page 238, in the body of the opinion, on page 240, the Indiana supreme court says:

"It has long been established that a contract against public policy will not be enforced. This principle is firmly fixed, and has often been applied to contract. There can, therefore, be no doubt as to the existence of the rule; the only question is to its applicability to the facts in this case.

"When the general public has an interest in the location of an office, a railroad station, or the like, a contract to secure its location at a particular place is held to be against public policy, and not enforceable. There are many cases holding that an agreement to locate a railroad station at a designated place is not enforceable, because against public policy. *St. Louis, etc., R. R. Co. v. Mathers,* 104 Ill. 257; *Williamson v. Chicago etc., R. R. Co.,* 53 Ia. 126; S. C. Am. R. 206 *vide* authorities note 214. The principle upon which these cases proceed is that the public good, and not private interest should control in the location of railroad depots, and this principle certainly applies with full force to an office of a purely public character, such as a postoffice. We find in these railroad cases, and there are very many of them, the principle which applies the rule governing such a case as the present It is true, that there is some difference in the views of the courts upon the question whether an agreement for the location of a depot is valid when it does not restrict the location to the place named, and no other, but upon the general principle, there is entire harmony. In the present case the difference in the opinions of the courts is an unimportant consideration, for here the location is restricted to one place, and no other, for a period of ten years, and the case, therefore falls within the holding of the cases most favorable to the appellant. We say that the location is restricted to one place for the reason that it is a matter of judicial knowledge that but one postoffice can be located in the city of Goshen. While the cases of which we have spoken establish a principle which rules this case, there are others, which in their general features, more clearly resemble the one at bar. Closely analogous in principle are those cases which hold that

contracts which may tend to the injury of the public service are void. * * * *

"There are many phases of injury to the public service, and we do not deem it necessary to examine the cases upon the subject, for we think·it quite clear that a contract which is made for the purpose of securing the location of an important office connected with the public service for individual benefit, rather than for the public good, tends to the injury of the public service. The case made by the evidence falls fully within the principle that contracts which tend to improperly influence those engaged in the public service, or which tend to subordinate the public welfare to individual gain, are not enforceable in any court of justice. Pollock Prin. of Cont. 279; Anson Cont. 175; 1 Whart. Cont., sections 402 to 414 inclusive. A wholesome rule of law is that parties should not be permitted to make contracts which are likely to set private interests in opposition to public duty, or to the public welfare. This rule is recognized in our own case of *Maguire v. Smock,* 42 Ind., 13 Am. R. 353·; where it was held that an agreement to pay a consideration to a property owner for signing a petition to secure the improvement of a street was void, although there was no fraud, and although the person to whom the promise was made was really in favor of the improvement.

"It is not necessary that actual fraud should be shown, for a contract which tends to the injury of the public service is void, although the parties entered into it honestly and proceeded under it in good faith. The courts do not inquire into the motives of the parties in the particular case to ascertain whether they were corrupt or not, but stop when it is ascertained that the contract is one which is opposed to public policy. Nor is it necessary to show that any evil was in fact done by or through the contract. The purpose of the rule is to prevent persons from assuming a position where selfish motive may impel them to sacrifice the public good to

private benefit. An English author says: 'But an agreement which has an apparent tendency that way, though an intention to use unlawful means be not admitted, or even be nominally disclaimed, will equally be held void. Pollocks Prin. of Contracts, 286.'"

And in this case, the Indiana supreme court cites with approval the case of *Tool Co. v. Norris,* by the supreme court of the United States heretofore cited in this opinion.

In the case of *The Peoria and Rock Island Railway Co. v. The Coal Valley Mining Co.,* 68 Ill. 489, it was held:

"That the duties which railroad corporations owe to the public, and which are the considerations upon which their privileges are conferred, cannot be avoided by neglect, by refusal, or by agreements with other persons or corporations, and that any contract to prevent the faithful discharge of any such duties, will be against public policy, and void."

Among the many cases cited by counsel for defendant in error to sustain their position, we find some which it seems to us clearly sustain the views expressed herein. From an examination of these authorities, it would seem to us that counsel for defendant in error in citing them, was laboring under what seems to us a misapprehension of the facts in the case, as shown by the evidence, and had in mind an entirely different contract than the contract which the evidence in this case shows was the consideration of this note. If the contract which was the basis of this note, was a subscription contract, given to the railroad company to aid in the construction, operation, or maintenance of its railroad, then the authorities cited by counsel for defendant in error would be in point; but as we view it, this is an entirely different kind of a contract, and it is a contract entered into with a director and stockholder of a railroad company, conditioned upon the

building of a railroad at a certain point by a certain time, and under the authorities above cited, we believe is void as against public policy.

Among the authorities cited us by counsel for defendant in error, is the case of *Pacific Railroad Co. v. Seeley,* reported in the 45 Mo., at page 212. In the syllabus, the court used the following language:

"A. agreed with the Pacific Railroad Company to deed it a certain lot of ground for purposes of speculation, in consideration that the company would locate a freight and passenger depot on his land. There was no evidence that the land was to be used for the general business of locating, constructing, managing, and using the road: *Held,* that although in one sense the company was a private corporation, yet its chartered privileges were granted, in part, to subserve great public interests; that such an agreement might be superinduced by prospects of mere gain, and thus the general welfare and good of the public might be sacrificed to subserve mere private interest; that for this reason, such an agreement was void as against public policy."

And the supreme court of Missouri, in the opinion at page 217, uses this language:

"But the broad position is that the company is a private corporation, and has the right to buy and hold all kinds of property the same as an individual. This position is wholly indefensible. Whilst it is true, in one sense, that it is a private corporation, yet the public is deeply interested in it. Its chartered privileges and franchises are not granted solely and exclusively for private emolument, but to subserve a great public interest.

"In *Wather v. Warner,* 25 Mo. 277, this court decided that the building of a railroad by a private corporation under

the authority of the legislature for the public accommodation was a public use for which private property might be lawfully taken. In all these enterprises, there is a mingling of both public and private benefit, and the interests of the public are not to be sacrificed to mere private gain.

"In the case of *Fuller v. Dames,* 18 Pick. 472, the action was on an agreement made in consideration of certain services in procuring the location of a depot at a certain place. It was a contract entered into between D. and F., and recited that D. was the owner of land which would be enhanced in value if the Boston & Worcester Railroad corporation should establish their depot on certain flats; and that, in order to procure the corporation to make such location of the depot, it would be necessary to form a joint stock company to purchase the flats and give a portion thereof to the railroad company for the depot, and that F. had agreed to aid in getting up such a company, and in causing the railroad company to fix its depot on the flats, it being understood that he was of the opinion that the railroad corporation, with a view to the public good and the interests of the stockholders, ought to have its depot there; and D. agreed to make F. a pecuniary compensation as soon as the depot should be located on the place specified. A company was accordingly formed and incorporated, with power to purchase and hold the flats, and to give a portion thereof to the railroad corporation as an inducement to establish a depot thereon; and an agreement was made between the two corporations, by which the depot was located on the flats. F. was a member of the railroad corporation at the time when he made the agreement with D. and subsequently became a member of the joint stock company.

"Although the court has previously sustained conditional subscriptions to stock, as heretofore noted, yet they held that this agreement was contrary to public policy and to open, upright, and fair dealing, because it tended injuriously to

affect the public interest in having the fittest location of the depot, and the interests of the two corporations, and consequently it was invalid.

"Shaw, C. J., speaking for the whole court, gave the subject the following lucid exposition: 'The case in question is, briefly, clearly within the operation of this salutary principle. Without considering other aspects of the contract, we are of the opinion that it was contrary to public policy and to upright and fair dealing, and it tended injuriously to affect the public interest in establishing the fittest and most suitable location for the termination of the Worcester railroad, for the accommodation of public travel; 2, as it affects the interests of the proprietors of the Worcester railroad; 3, as it affected the interest of the joint stock company incorporated under the name of the South Cove corporation. The Boston & Worcester railroad was established for the public accommodation and convenience in the transportation of passengers and merchandise. Like a country road, it was in many respects a common highway. It has been so held in case of turnpike roads. *Commonwealth v Wilkinson,* 16 Pick. 175. It may be said that it was to be constructed and located by the corporation. True, as in the case of a turnpike road, it is constructed in the first instance at the expense of a private company of adventurers, under the sanction of the legislature, incorporated for that express purpose, and they are to be reimbursed by a toll levied and regulated by law for their remuneration. The work is not the less a public work, and the public accommodation is the ultimate object. It is also true that it was left to the corporation and directors to fix the termination and place of deposit. In doing this, a confidence was reposed in them, acting as agents for the public—a confidence which it seems could be safely so reposed, when it is considered that the interests of the corporation as a company of passenger and freight carriers for profit was identical with the

interests of those who were to be carried, and had goods to be carried,—that is, with the public interest. This confidence, however, could only be safely so reposed under the belief that all the directors and members of the company should exercise their best and their unbiased judgment upon the question of such fitness without being influenced by distinct and extraneous interests, having no connection with the accommodation of the public, or the interests of the company. Any attempt, therefore, to create and bring into efficient operation such undue influence has all the injurious effect of a fraud upon the public, by causing a question which ought to be decided with a sole and single regard to public interest to be affected and controlled by considerations having no regard to such interests.'

"The agreement in this case was to give the company an interest in town lots, provided it would locate its station at a specified place. It is easy to perceive how such a transaction might be perverted so as to operate most injuriously to the public. Speculators, and land proprietors, for the purpose of enhancing their property, would always be on hand to obtain locations, and forcing people to their premises, regardless of the consideration whether they were the most fit and convenient; and the companies, tempted by the prospect of gain, would accede to these propositions, and thus the general welfare and good of the public would be sacrificed to subserve more private interests. Whilst conditional subscription to stock may be entirely valid, I do not think agreements of this character should be upheld."

In the case of *Workman v. Campbell,* cited by defendant in error, reported in the 46 Mo. page 305, that court cites with approval the above case of *Pacific Railroad Company v. Seely,* and add this to what was said in the former case.

"The company have a deep interest in these transactions and the directors and members of the corporation will not be permitted to reap a private gain or benefit at the expense of the public convenience, and to the detriment of the community."

In the case of *Berryman v. Trustees of the Cincinnati Southern Railway,* reported in 14 Bush (77 Ky.) at page 755, cited by defendant in error, which was a case sustaining their position that public policy does not prohibit voluntary contributions to railroads for the purpose of construction, *etc.* or render void a contract based upon the onsideration that the road shall be located in or through a certain locality unless the public interest is to be sacrificed by it, the court, in the body of the opinion, at page 761, uses the following language:

"The cases in which an agreement to pay has been declared void and against public policy, are those where the officers of a corporation, for the advancement of their own private interests, have agreed to accept a consideration for locating such improvements in a particular locality. In the case of *Fuller v. Dame,* 18 Pickering, Dame, the owner of the land, promised Fuller, a member of the corporation, a certain amount of money if he would influence the location of the road. This was a mere private agreement between the two, and the court held that it might cause an improper influence to be exerted by the stockholders, and an agreement to pay for such exercise was void.

"In the case of *Holliday v. Patterson,* 5 Oregon, Holliday was the president and director of the Oregon & California Railroad Co., and agreed with Patterson, in consideration of a certain sum of money, that he would cause the line of railway to be located on a particular route, and a depot to be built at a certain place.

"In the case of the *Pacific Railroad v. Seely,* 45 Mo. it was agreed to give to the company a tract of land to be divided into town lots for the purpose of speculation, on condition that a depot should be built at a certain point. The court held that such speculations were incompatible to the object that brought the corporation into existence. In all these cases, there is a plain departure from the object contemplated by the charter, or the facts developed the existence of contracts by which the officers or stockholders of corporations have in some way violated their trust. The trustees in this case were attempting to devise the means for constructing this great line of railway, and were influenced alone by their desire to succeed in the enterprise, from which no private gain is sought, at least by this contract, but the public interest is subserved and the objects of the charter accomplished, in obtaining their contributions in aid of its completion. The interest of the road is alone looked to, without any individual benefit to the trustees, or any violation of their official duties.                                                            \

"In the case of the *Cumberland  Valley R. R.  Co. v. Baab* 9 Watts, 458, the subscription (not of stock) was made on condition that the company would locate its bridge across the river at a particular place. The contract is held to be valid, and not against public policy. A contract to convey real estate to a railroad company for the purpose of the railway, provided it built the road to a certain point, and its depot in a certain town, was also held to be a valid contract. Public policy  does not  prohibit  voluntary  contributions to  railroads  for purposes of  construction, or render void a contract  based upon  the consideration  that  the  road will be located in or through a certain locality, unless the public interest is to be sacrificed by it. The prospective business of the road  must, to a certain  extent, control its location; and when the means may be insufficient to complete it, or the advantages to be derived from its location may be insufficient to induce voluntary donations, or sub-

scriptions, based upon a consideration that the road will be so located as to confer the benefit, we see no reason for holding such agreements void; *but where officers of such corporations, who are also trustees of the public, undertake to receive donations for their own private use, or make contracts by which they are to be paid for using an influence that will, or may locate a line of railway in a particular locality, there is a necessity for holding such contracts void."*

It would seem from a reading of the brief of counsel for defendant in error, that the views herein expressed as to a note payable to a stockholder or director of a corporation, for his personal benefit, depending for its consideration upon the location of a railroad at a certain point, being void as against public policy, was shared in by them, and was believed by them to be the true rule of law because we find in their brief on page 10, the following language:

"Contracts made with an officer of a railroad corporation, and for his personal benefit, to induce him to secure a particular location, stands upon other and different grounds and is not upheld, * * *"

While it is true that this language is used in the brief of counsel for defendant in error as a quotation, and the authorities are cited from which they quote, we have carefully examined these authorities, and fail to find therein this language. But however this may be, this language is cited with approval by counsel for defendant in error in their brief, hence we have the right to presume that they deem it applicable and pertinent to the issues involved in this case.

We have carefully examined all the authorities cited by counsel for defendant in error, and we have not found any authority which holds that a contract made with a director of a railroad company, that for a pecuniary consideration

to himself, a railroad shall be located at a certain point, is not void as against public policy; neither do we think such an authority can be found. It is argued by counsel for the defendant in error that as in this case there is no evidence to show that the public interests are to be in any way injured, that for this reason the contract should not be declared void, but we think this contention is fully answered in the cases above cited, where almost universally the authorities lay down the rule that it is not necessary that affirmative proof should be made that some public interest is being injured, but the mere fact that the contract by its terms, and in its effect would tend to produce that result, and would be offering an improper inducement for the exercise of discretion which should be honestly and faithfully exercised with a view to the protection of public and private interests, and should not be hampered by any consideration of personal pecuniary gain. It is not, as the authorities say, so much what the effect actually is, as what it is likely to be, and what the tendency of such contracts would be, that the policy of the courts is to remove from all cases where the parties are called upon to exercise discretion involving public and private interests the element of temptation to improper action occasioned by pecuniary and mercenary motives.

Hence, we think for the reasons herein expressed, and the authorities herein cited, that the action of the district court in overruling the demurrer to the evidence was erroneous, and as this cause must be reversed on this ground, is is not necessary for us to enter into the discussion of the question whether the fact that the Atchison, Topeka & Santa Fe Railroad Company were the principal owners and principal stockholders of the Eastern Oklahoma Railway, and the

construction of the road by that company to the point mentioned in the note on and prior to the time mentioned in the note, is a compliance with the terms of the note or not.

For the reasons herein expressed, the decision of the district court is reversed and remanded, with directions to sustain the demurrer to the evidence, and render judgment in favor of the defendant and against the plaintiff for costs.

Burford, C. J., who presided in the court below, not sitting; Burwell, J., dissenting; Beauchamp, J., absent; all the other Justices concurring.

Dissenting opinion by

BURWELL, J.: A recovery on the contract involved in this case is denied by the majority of this court under the theory that a contract taken by an officer of a railroad corporation in his individual name for the payment of money to himself, in consideration of the corporation performing some act, is presumptively for his personal benefit and in violation of his duties to his principal and therefore void as against public policy.

My brethren evidently desired to fix a high standard for the conduct of corporate officers and agents by condemning a contract taken in the name of such; but in this attempt they have in effect branded as corrupt and dishonest or at least as corrupting in its tendencies, a simple obligation which is capable of a different interpretation. This in my opinion is unwarranted and in violation of the plain provisions of statutory enactment, and the general law of the land as declared by the text writers and the courts of last resort. Were the particular contract in question the only one to be affected by this

decision, I might, although firmly convinced of the injustice the rule imposes, be content with recording my vote against it; but as many other similar contracts must be measured by the standard adopted, I feel impelled to express my disapproval and the reasons which have directed my mind to regard the act of an agent or officer of a corporation as honest, unless by its terms it is capable of no such construction, until by affirmative evidence it is shown to be corrupt and in violation of the rights of his principal.

The record in the case is short and there is but little room for disagreement as to the facts. I desire, however, to state them in the order of their occurrence so that they may be analyzed, weighed and considered intelligently in the light of the authorities which I hope to refer to and which I believe sustain the position here taken.

On July 29th, 1899, U. C. Guss and others, at the request of Henry E. Asp, Esq. (who was at the time the attorney for the A. T. & S. F. R. R. Co. for Oklahoma), and other officers of such company, incorporated and organized the Eastern Oklahoma Railway Company. This company was evidently organized as a construction company for the purpose of extending the lines of the Santa Fe company. A contract was then entered into with Coyle & Guss whereby they were to procure the right of way to Cushing, the Santa Fe company paying therefor by vouchers issued by Mr. Asp. The evidence is not clear as to whether this contract of Coyle & Guss was with the Eastern Oklahoma Railway company or with the Atchison, Topeka and Santa Fe Railway Company, but in the light of all the evidence it is fair to assume that it was with the latter. Still if it be determined that it was with the other company,

the evidence shows that Coyle & Guss had a contract whereby they were to procure the right of way, and beyond this and the fact that the right of way was actually paid for by the Santa Fe Company, we are in absolute ignorance as to its terms and provisions.

Coyle & Guss then entered into a contract with the plaintiff in error (L. K. McGuffin) whereby he agreed to pay to them the sum of two hundred and fifty dollars, as shown by the following instrument which is the contract in controversy:

"($250.00)                              Cushing, Okla., 7-23-'01

"July 1st, 1902. If Santa Fe R. R. is built to Cushing by this date (July 1, 1902) A. T. & S. F. R. R. to Cushing, Oklahoma, in consideration of its being built for value received, as principals promise to pay to the order of Coyle & Guss, two hundred fifty dollars at Cushing Bank, Cushing, Oklahoma.

"This note is given upon the consideration that a failure to comply with the above requirements shall render this note void.

"(Signed) L. K. McGuffin."

The right of way was obtained and the road built as agreed.

If the contract of Coyle & Guss was with the Santa Fe company, then Guss was not an officer of that company, unless it be said that the Eastern Oklahoma Railway Company was a mere agent of the Santa Fe company, and as such, its directors occupied confidential relations to the latter company. This is the view evidently taken by the majority of the court, and while I feel that such position is an extreme application of the rule, I contend that even if it be admitted, in the ab-

sence of evidence to the contrary, it must be presumed that Coyle & Guss acted as honest men in taking the contract in question, and with the full knowledge and authority of the Santa Fe company, and for a valuable consideration flowing from them to it. For aught the record discloses Coyle & Guss were to reimburse the Santa Fe company for the money advanced by it for the right of way, in consideration of the right of way to take this and other like contracts; or these bonus contracts may have been taken under an agreement with the Santa Fe company in consideration of the service of Coyle & Guss in securing the right of way.

Either of these or any one of many other arrangements would be fair and permissible under the law. I admit that the mere fact that the contract is made payable to Guss, as one of the payees, (if it be held that he occupied a confidential relation to the Santa Fe company) is a circumstance which may be considered with other affirmative evidence in determining the question of fair dealing on his part with such company; but it is not alone sufficient to overcome the presumption of honesty. The most that can possibly be said is that the contract might be dishonest. The mind can as readily conceive of circumstances from which it could have sprung and wherein every act from the beginning to the consummation of the entire transaction could be influenced by integrity and uprightness. Therefore the court should have treated it as honest rather than dishonest; as having been executed for a valuable consideration, in preference to declaring it to be in violation of good morals and corrupting in its tendencies.

Where a contract is capable of two interpretations, one consistent with honesty and the other indicating fraud and a

breach of duty, the former should be adopted.    To hold otherwise would be to admit that the majority of men are unworthy of confidence and trust.   The converse is not only true but has been recognized by the law for hundreds of years.    Attention is directed to a few of the authorities:

*Merrill v. Melchior*, 30 Miss. 516:

"If a contract is susceptible of two interpretations, one legal and the other illegal, that interpretation shall be given to it which renders it valid."

Chitty on Contracts, vol. 2, p. 977:

"It is also a maxim in courts of equity, that wherever confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence, is possessed by the other; and such confidence is abused, or influence exerted to get an advantage at the expense of the confiding party; a contract obtained by such means will not be permitted to stand, although it could not have been impeached if such confidential relation had not existed.

"The presumption of law, however, is in favor of the legality of a contract; and therefore, if it be reasonably susceptible of two meanings, one legal and the other not, that interpretation shall be put on it which will support and give it operation."

*Guernsey v. Cook*, 120 Mass. 501.

"The contract, if reasonably susceptible of two meanings, one legal and the other not, must indeed receive an interpretation which will support rather than defeat it, and the presumption is in favor of its legality."

Pomeroy on Contracts.   Foot note No. 3 at bottom of page 365,

"The agreement must be legal or illegal, and it is not within the discretion of the court to refuse specific perform-

ance because an agreement savors of illegality; it must be shown to be illegal. This theory is certainly in accordance with the general view stated in the text, that the defense of illegality is often an unrighteous one which courts do not favor, and never sustain out of regard to the party urging it. If this be true, the burden most clearly ought to rest upon the one who alleges this illegality."

Current Law, vol. 1, page 638,

"A contract is to be held invalid only when it will admit of no other construction."

*Equitable Loan & Security Co. v. Warring, et at,* (Ga.) 44, S. E. Rep. 320,

"It will not be presumed that people intend to violate the law, and the language of their undertaking must, if possible, be so construed as to make the obligation one which the law would recognize as valid. All ambiguities are to be resolved in favor of legality and against illegality. The contract is to be held illegal only when it will admit of no other construction."

The supreme court of Nebraska in the case of *Horton v. Rohlff*, 95, N. W. Rep. 36. said:

"The rule is that the contract should be supported if possible rather than defeated. If a contract admits of more than one construction, one of which will render it inefficacious or nullify it, that construction should be adopted which will carry it into effect, for there is no presumption against the validity of contracts. Nor can we suppose that the parties sit down to make a contract providing for a particular event, when that very event would make it void."

Many other authorities might be cited to the same effect. This, however is unnecessary, as the general rule will hardly be denied. The contention in this case is that the contract on its face shows that it is against public policy.

This court had occasion to consider a similar instrument in the case of *Enid Right of Way and Townsite Co. v. Lile* (Okla.) 82 Pac., 810, in which the same doctrine was announced. I then, as in this case, recorded my view insisting that there was nothing about the contract which suggested fraud or a breach of trust on the part of the payee, or that could not be harmonized with fair dealing; and when I consider this contract and attempt to measure it by those rules which determine the question of public policy, I am forcibly impressed with the following language of Sir. G. Jessel, M. R., in the case of *Printing & Numerical Registering Co. v. Sampson*, L. R. 19 Eq., 462:

"It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing more than another which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice. Therefore, you have this paramount public policy to consider: that you are not lightly to interfere with this freedom of contracts."

To the same effect, is Hammon on Contracts, (bottom) page 388:

In the dissenting opinion in the case of the *Enid Right of Way and Townsite Co. v. Lile, supra,* it was insisted that a note given to a railway company for its own use and benefit, in consideration of the locating of a station or the right of way over a particular line, is valid and binding; but that a note taken by an officer of such company for his own use and benefit, without the knowledge or consent of his company, for the locating of a depot or of the line of road over certain

localities is void as against public policy.    Citing authorities in support thereof.

The opinion in this case, while intimating that the majority opinion in the Lile case possibly went too far in discussing the first proposition, maintains that the contract in question is for the individual benefit of Coyle & Guss and therefore void, and a recovery cannot be had thereon.    Let us consider briefly this contention.    If void, it must be for one or more of certain reasons suggested: First, because of failure of consideration; second, because under no circumstances can an officer of a corporation accept a·contract from a third party to himself in consideration of the performance of an act by his company which may inure to the benefit of the maker of the contract, even though such corporate officer may have paid his company a valuable consideration therefor; or, third, because Coyle & Guss  are not the real parties  in interest. Neither contention can be upheld.    Consideration for the contract must be presumed and the burden was on the defendant to plead and prove the contrary.    Coyle & Guss had a right, in the trial court, to rely upon this well established principle of law.    In Current Law, vol. 1, page 696, it is stated :

"A consideration will be presumed  as to a contract under seal or a contract in writing."

*Clarke v. Marlow,* (Mont.) 50 Pac. 713:

"The expression 'value received' is not essential to the validity of a note, where no statute requires its use, as such paper at common law implies a consideration where none is expressed."

*McClain v. Lowther,* 35 W. Va., 297:

"The drawing and delivery of a check implies the indebtedness of the drawer to the payee to the amount of the

check, and in an action upon the check it is unnecessary to aver in the declaration any further consideration."

And in the case of *Ash v. Beck,* (Tex. Civil Court of App.) 68 S. W. Rep. 53, it is said:

"A written contract imports a consideration, and where none is expressed the real consideration may be shown, under proper allegations."

*University of Des Moines v. Livingston, Adm.,* (Ia.) 10 N. W. Rep., 738:

"A written contract imports a consideration; but failure of consideration may be shown to defeat an action thereon."

There is no principle of law more familiar than the rule that where an action is commenced on a promissory note, consideration is presumed and if the maker claims failure of consideration he must plead and prove it. *Kiestwetter v. Kress et al* (Ky.) 70 S. W. Rep. 1065; *Woodworth v. Vietch, Adm.* 29 Ind. App. Court Rep. 589; *Gallagher Adm. v. Kiley* 115 Ga. Rep. 420; *Brown v. Johnston Bros.* 135 Ala. Rep. 608; *Cox, Trustee v. Sloan,* 158 Mo. 411; *Martin v. Patterson* 27 So. Car., 621; *Nichols and Shepard v. Dedrick,* Minn., 63 N. W. Rep. 1110; *The Mainstee Nat'l Bank v. Seymour* 64 Mich. 59; *Young v. Shepard's Estate,* 124 Mich. 552; *Perot v. Cooper, Admx.,* 17 Colo., 80; *Lipsmeier v. Venslage,* 29 Fed. Rep. 175.

In Page on Contracts, vol. 1, sec. 279, the rule is laid down as follows:

"At common law, negotiable contracts are said to import a consideration; that is, in the absence of evidence on the point, it will be presumed that there was a sufficient consideration; and it is for the party denying the existence of a con-

sideration to show that there was none. This is true even if no consideration is recited on the face of the instrument, and words such as, 'value received,' are wanting."

The general rule as shown by these authorities, has been emphasized by legislative enactment. Section 774, Wilson's Rev. & Ann. St. of Okla., 1903, provides that:

"A written instrument is presumptive evidence of a consideration," and that "the burden of showing a want of consideration, sufficient to support.an instrument, lies with the party seeking to invalidate or avoid it."

Similar statutes have been construed by other courts, as will be seen from the following cases:

*Lowry v. Danforth*, 95 Mo. App. Rep. 441:

"A promissory note, whether negotiable or not, imports a consideration under Revised Statutes of 1899, sec. 894."

*Topley v. Herman*, 95 Mo. App. Rep. 537:

"The instrument not only recited a consideration, but it imported one until some contrary showing was made, according to our Revised Statutes 1899, sec. 894."

The code of California provides:

"A written instrument in presumptive evidence of a consideration." · And the supreme court of that state, in commenting thereon, in the case of *Toomey v. Dunphy*, 25 Pac. 130, said:

"This provision is general and applies to all contracts where a different rule is not expressly prescribed. And we think that, had the legislature intended that contracts, like the one in question, should state a consideration for the services to be rendered by the broker or agent, it would have expressly said so."

*First M. E. Church, in Fort Madison, v. Donnell, Ia.,* 64 N. W. Rep., 412:

"The demurrer also presented the question of consideration. A contract in writing purports a consideration, under section 2113 of the code; and if a want of consideration is presented, it must be by answer."

There is in force in Kansas a statute similar to section 774 of our code. In the case of *Fuller v. Scott,* 8 Kans. 25, Justice Valentine said:

"An agreement to extend the time of payment of the note is a sufficient consideration to sustain the guaranty. Such an endorsement is a contract in writing as will import a consideration. (Comp. Laws, 351, S. S., 6, 7, Gen. Stat., 183, S. S. 7 & 8). And if the party who made the endorsement claims that there was no consideration for the guaranty, the burden of proof will rest upon him to show it, and he must show it by a preponderance of the evidence."

*Waynick, et al. v. Richmond, et al.,* 11 Kans., 488, involved the interpretation of a bond for a deed, which instrument recited no consideration whatever. The court said:

"The instrument sued on, though in form a bond with a condition, is, in legal effect, an agreement to convey. 'A bond for money, with a penalty for not doing a certain thing, will be held to be a contract to do that thing.' Being a contract in writing, it imports a consideration: Gen. Stat. 183 ch. 21, sec. 7. The agreement then is as though it read, 'For value received, I hereby agree to convey etc.' "

Again, in the case of *Roller v. Ott,* 14 Kans. 609, it is declared:

"But the contract is shown to have been in writing, and therefore, unless the contract or the petition affirmatively shows that there was no consideration, the contract itself will

import a consideration. Mere silence on the part of the petition or contract will not imply that there was no consideration. But, on the contrary, where the petition does not affirmatively show that there was no consideration, it will be presumed *prima facie* that there was a sufficient consideration."

In the trial of a defense to a written contract for want of consideration, it must not only affirmatively appear that the maker did not, in fact, receive any consideration, but also that the payee did not suffer any loss or detriment. In discussing this question, Mr. Justice Minshall, in the case of *Dalrymple, Adm. v. Wyker, Adm.*, 60 Ohio State Rep. 108, said:

"We think that it is well settled on principle and authority, that, in pleading a want of consideration as a defense to a note, it is necessary to aver that there was no consideration for the note; a mere averment that there was none moving to the maker, is not sufficient. For *non constat.* but that there may have been a consideration in loss or detriment to the promisee; and, if so, such loss or detriment is sufficient to support a promise based upon it." Citing authorities.

This brings us to the consideration of the right of Coyle & Guss to take the note in their own name. Under the law, could it be so taken, conceding that it was done in good faith, with the consent of the company? The most diligent search has failed to reveal a single authority which, when carefully analyzed, denies such right. I fully appreciate the fact that in the nation, in the state and by the individual there is a growing tendency to hold corporations and especially the railroad corporations, as well as their officers and agents, to a more strict account for their acts; but in this striving for rules that will more nearly do justice between these agencies

and the individual, we should be careful that the mental vision is not so dimmed by sympathy for the weak that reason may fail to see the rights of the strong.    The courts are not the creators of corporations, but the scales of Justice should be so balanced that these artificial persons of legislative origin would have no right less sacred than those of the individual, and no privilege denied to the humblest subject. They are strong because they are managed and controlled by the combined wisdom of many, while the natural person must battle alone.    But the rich and the poor, the strong and the weak should be governed by the same law.    If any other rule were adopted, evils resultant upon such a course would be many.    The rights of all persons, natural and artificial, similarly situated, must, if justice is to be perpetuated, be controlled by the same rules of conduct.    And in the determination of cases like the one now under consideration, the courts should take the law as it exists.    Take it as declared by the legislative branch of the government, and as built up by the wisdom of the learned judges during the past centuries; and innovations upon long and well-established rules should be made only when it is apparent that they are fundamentally wrong, or that the changing conditions of civilization demand their modification.

If contracts of this kind are void, is it not rather strange that other courts have not seen the evil contained therein and stricken them down as they have done with other contracts which are corrupting in their nature? It is insisted by my brethren that they have, but as I view the cases relied upon, they are clearly distinguishable, and the majority opinion mistakes the contract, which may or may not have been the product of a fraudulent scheme, for fraud itself; and fraud

will never be presumed, but must be proved by evidence, unless the court can say from common experience and knowledge of affairs, that it must in its tendencies necessarily be in conflict with an honest purpose or calculated to persuade those standing in confidential positions from paths of rectitude and duty; as, for instance, when an agent or officer of a corporation agrees, for a consideration, to give his vote or influence for the election of a third party to a corporate office. Contracts of that character, upon their face, show corruption. *Lum v. McEwen, et al,* 56 Minn., 287; *Attaway, et al v. Third Nat'l Bank of St. Louis,* 93 Mo. 485; *Guernsey v. Cook,* 120 Mass., 501; *McDonald v. Haughton,* 70 N. C., 393; *Noel v. Drake,* 28 Kans., 265; *Wilbur v. Stoepel, et al,* 82 Mich., 344.

But a contract which, *prima facie,* shows that the consideration is for the building of a line of road, where it is payable to the company, has finally been decided by this court (*W. B. Piper v. Choctaw Northern Townsite & Improvement Co.* 16 Okla. 436) to be valid, and that recovery can be had thereon. The mere fact that such contract is payable to an officer of such company does not imply fraud or even suggest it.

In Clark & Marshall on Private Corporations, vol. 3, page 2294, sec. 758, it is said:

"A contract between an officer of a corporation and a third person is contrary to public policy, and therefore illegal and void, where it contemplates a fraud upon the corporation, or where, by giving the officer a secret profit or personal advantage, or otherwise, it places his private interests in conflict with his duty to the corporation."

It will be observed that practically all of the decisions and text writers use the words "secret interest." It frequently

occurs that officers of corporations take notes in their individual names, and the policy of the courts has universally been to uphold them. The important question is, Was there a consideration?—as, for instance, where one borrows money from a bank and the cashier takes the note in his individual name. Would such a note be void as against public policy, even though it should show upon its face that it was in consideration of money advanced by the bank? Certainly not. And an action would lie in his individual name, as we shall presently observe.

In Clark & Skyles on the Law of Agency, vol. 2, page 1336, the rule is announced as follows:

"So where a promissory bill or note is made payable to an agent in person, or to an agent for his principal, or to an agent for the use of his principal, or to an agent as trustee, the promise is deemed to run to the agent, and he may sue thereon in his own name."

In the majority opinion it is stated:

"Now we take the true rule of law to be that where a note is made payable to a certain person or persons, as payee therein, and there is nothing in the wording of the note to indicate, and no showing in the evidence that any other person has any interest therein, the presumption will be that the note is for the personal benefit of the payee named therein."

As a general rule the above statement is correct, but this presumption is no stronger than the presumption that the note is for a valuable consideration and that it is without fraud and was taken with the full knowledge of the railroad company. Coyle & Guss are the legal owners of the notes, and it is immaterial whether they held the legal title for the railroad company or in their individual right. In either event

they were entitled to recover. The authority of a railroad company to accept aid for the locating and maintaining of its line of road, or a depot, at a particular place, being established in favor of such right, contracts made payable to its officers and agents, in all fairness, should be measured by the same standard as similar contracts to cashiers of banks and officers of other corporations. The consideration stated in the note in controversy will support it as fully as though it had been given for money advanced or for the building of a house, or for the performing of any other future act. If the railroad could take such a note in its own name, it is elementary that it could take it in the individual name of its director or agent.

In *Clay v. Day,* 2 Me. 305, Chief Justice Mellon said:

"If a promissory note be made to the agent or treasurer of a private association, by his name, with the addition of his agency of office, he may have an action in his own name on the note, the addition of his character being but *descriptio personae.*"

Another case is *Johnson v. Catlin,* 27 Vt. 87. The following rule was announced by the court:

"In cases of bills of exchange and promissory notes, a promise to an agent (naming him) and not his principal, but with the word, "agent" or "cashier" added to his name, is a promise to the agent as an individual, and the addition is simply descriptive of the person. And where the agent or cashier is the payee of the bill or note, which is accepted or given for value, he may, in an action in his own name against the acceptor or maker, recover upon the money counts."

North Carolina, in the case of *Horah, Cashier v. Long, et al,* 20, N. C., 416, declared:

"A note payable to A. B. cashier or order, and negotiable and payable at a particular bank, is payable to A. B. individu-

ally the word "cashier" being only descriptive of the person; and the expiration of the charter of the bank at which the note is negotiable and payable, will not, at law, affect his right to recover on it."

Another case worthy of consideration is the case of *McHenry v. Ridgely*, (Ill.) 35 Am. Dec., 110. Suit was commenced upon a note, which was in the following form:

"$400.                              Jacksonville, Nov. 4, 1836.

"On or before the 16th day of July next I promise to pay to E. W. Palmer or order, four hundred dollars, for value received.

"Witness my hand and seal,
                              "GEORGE McHENRY, (Seal)"

The note was endorsed as follows:

"For value received, I assign the within note to T. Worthington.

                              "E. W. PALMER.

                              "Dec. 12, 1836.

"Pay to N. H. Ridgley, Esq., cashier or order.

                              "T. WORTHINGTON."

The court in discussing the issues said:

"The defendant pleaded three pleas in bar, in substance: (1) That the note sued on was assigned to the president, directors and company of the State Bank of Illinois, in the name of N. H. Ridgely, Esq., cashier of said bank, according to the usages of the bank, and that the legal and beneficial interest was, by said assignment, vested in the bank. (2) That the note is the property of the bank, and that the plaintiff has no interest in it. (3) That the note is the property of the bank and was assigned to the plaintiff, Ridgely, as the cashier, according to the custom and usage of the bank; and that

Ridgely is merely the agent of the bank, without any property in the note sued on. To these pleas a demurrer was interposed by the plaintiff and sustained by the court. This decision is assigned for error.

"It is true, as a general proposition, that a corporation may not only sue in its own name, but, when its rights are asserted, it must sue in its corporate name; but the authorities upon this point and those referred to relative to the obligation of the principal, or the one beneficially interested in the suit, are not applicable to the present case. The law is well settled that, where a note is payable to bearer, or is endorsed in blank, a suit may be maintained in the name of any person who is the holder of the note, without his being required to show an interest in it, unless he possesses the note under suspicious circumtances; and if the question of *mala fide possessio,* which is one of fact, to be submitted to the jury, is not raised by the defendant, the court will not enquire into the rights of the plaintiff, but will consider possession of the note as evidence of property."

It is true that, under the statutes of Oklahoma, it is provided that every action must be prosecuted in the name of the real party in interest, but I do not deem it necessary to cite authorities to show that one who, as payee, holds the legal title to a promissory note, as agent or trustee, either expressed or undisclosed, is a "real party in interest" within the purview of the statute. It is customary to bring the action in the name of the party who holds the legal title. *Cocke v. Dickens, Assignee & Co.,* 4 Yergers (Tenn.) 29; *Stoll & Mathews v. Sheldon,* 13 Neb., 207; *Shepherd, et al v. Evans,* 9 Ind., 260; *Bird v. Daniel,* 9 Ala., 302: *Goodman & Mitchell v. Walker,* 30 Ala., 482.

In *Bryant v. Dona,* 3 Gilman's Rep., 349, the supreme court of Illinois, in an action on a judgment, said:

"The sixth plea is clearly bad. It is a matter of no importance whether the plaintiff had any substantial interest in the subject matter of this proceeding, or whether it was commenced with his knowledge, or by his consent. It is sufficient if he had the legal interest. Of this the record affords conclusive proof. He was the plaintiff in the judgment against Phillips, and the cause of action against the plaintiff must be prosecuted in his name. If he has parted with the beneficial interest, the equitable assignee has the undoubted right to sue in his name to enforce the liability."

I have considered the record presented to this court and familiarized myself with the contentions of the respective parties, and firmly believe that the judgment is unsupported by the authorities and in conflict with those principles of justice which accords to every man that which is his own. The defendant comes into court upon a record which discloses that the company built the road as it was agreed it should. There was not a scintilla of evidence tending in the least to show that Coyle & Guss did not act in good faith, or that the note was taken secretly and without the knowledge of the company, or that the road had failed to perform the contract in any particular. No advantage was taken of the maker of the note and none was claimed by him. It was made voluntarily, with full knowledge as to its conditions, and having received the benefit of the expenditure of money which the note in suit presumptively influenced, at least in part, it is only fair that he should pay his debt according to the terms of such obligation. If the company had failed in any particular and Coyle & Guss paid no consideration for the note, the defendant could have pleaded and proved such fact and shown that they were simply the agents of the company, and reduced his lia-

bility in conformity with the demands of equity. *Newton v. Turner,* (La.) 25 Am. Dec. 173; *Merrill v. Randall,* 22 Ill. 227.

But having received the consideration named in the note, in the absence of fraud, which has not been established, the defendant cannot be heard to question the right of the payees to recover. *Berry v. Barton, et al,* 12 Okla., 221; *Fetch v. Beaudry,* 40 Cal., 439; *Frost v. Hartford,* 40 Cal., 165; *Wedderspoon v. Rogers,* 32 Cal., 569; *Monroe v. Fohl,* (Cal.) 14 Pac. 514; *Bank of Shasta v. Boyd* (Cal.)., 34 Pac., 337; *Wheeler v. Barr, et al* (Ind.) 34 N. E., 591; *Johnson v. Conkling,* (Ind.) 21 N. E. 462; *Blacker v. Dunbar,* (Ind.) 9 N. E., 104; *Offutt v. Bucker* 27 N. E., 589; *Nicolay v. Fritschle,* 40 Mo., 67.

The note was fair upon its face. Unfairness has not been shown. The plaintiffs (below) have been deprived of a legal and equitable right, and the defendant apparently permitted to beat a just debt. The decision instead of promoting honesty and fair dealing, will encourage the dishonest and unscrupulous to adopt technicalities to escape their obligations.

I believe that public policy demands the rule for which I contend. However, my associates, after full consideration, felt constrained to adopt a different rule, which has become the law of this jurisdiction, and by it, all are bound.